*In re* MARRIAGE OF FRANCINE LEOPANDO, Petitioner-Appellant, and OLIVO LEOPANDO, Respondent-Appellee.

First District (2nd Division)    No. 82-44

Opinion filed May 11, 1982.

Gregory P. Turza, of Chicago, for appellant.

Paul A. Karkula, of Edward R. Vrdolyak, Ltd., of Chicago, for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

After the trial court had initially awarded temporary custody of a 4-year-old child to his mother, Francine Leopando (Francine), it awarded permanent custody, after a hearing, to the father, Olivo Leopando (Olivo). Francine appeals. The issue we address is whether the trial court abused its discretion in awarding custody to the father.

The parties were married on December 23, 1973. The minor child, Phillipe, was born October 7, 1976. Francine was appointed temporary custodian of Phillipe on September 20, 1979. The parties lived together in the marital home in Lansing, Illinois, with Phillipe, through the hearing.

Francine testified she was a critical-care nurse specialist. She worked two to three weekends per month, during which time she left the house at 2 p.m., and arrived home after midnight. She left Phillipe with a baby-sitter while she was gone. It would be in Phillipe's best interest for her to have custody of him because she is with him most of the time. He confides in her, she feeds him, clothes him, bathes him, takes him to the physician, to the dentist, to school and to the gym. She and Phillipe take exercise classes together, swim, ice skate, roller skate, play ball, jog and read together. She takes him to his gymnastics class twice per week at the YMCA.

Phillipe has attended a Montessori school since he was 22 months old. At the time of the hearing he was attending five days per week from 9-11:45 a.m. Francine described in detail the procedures followed in the classroom, what Phillipe does there and how she works with him on his homework. She has asked Olivo to come with them to church on Sunday and to participate in functions such as the school picnic, but he has refused. She tries to put the child to bed by 8:30 p.m., but this was difficult since Olivo did not come home until approximately the child's bedtime, or later, with a new toy each night. Olivo also gave Phillipe a new toy every morning, which made it difficult for her to get him to school.

Francine cooks everyday, makes sure Phillipe eats a balanced diet, prepares her own foods rather than using canned foods and gives candy only occasionally. She and Phillipe have already eaten by the time Olivo gets home. She followed certain safety precautions where Phillipe was concerned; however, Olivo left medication around the house, allowed Phillipe to stand in the car without his seat belt, to ride in the back of a pick-up truck unattended and to go outside in the winter with his coat open and no shoes on. Olivo gave Phillipe dangerous toys, such as a BB gun, a sling shot, a fencing sword and police handcuffs. Olivo never took the child to the dentist or to the pediatrician. Francine disciplined Phillipe by telling him, on eye level, of what she disapproved. She occasionally spanked him. Phillipe's father has read to him on occasion and played with him infrequently. Francine on many occasions attempted to discuss the child with Olivo but he refused and walked away. As Phillipe is too young for Francine to work full-time, she intended to continue working part-time only. She would not work full-time while the child is in school full-time, as he still might need her. If she does not receive support she would have to move to Florida, where her parents can help out.

Joyce Skully testified that she was a caseworker from the Cook County Department of Supportive Services. When she interviewed Olivo, he told her he gets home between 7 and 8 p.m., and that his hours vary. He liked to take Phillipe to a friend's house, and he took the child out in the evenings about once per week or once every other week. Olivo ad-

mitted that he hit his wife in front of Phillipe because she called him names and that he would continue to do so. He thought he would be a better custodial parent because of newspaper clippings and magazine articles which described divorced women's boyfriends beating children. He could give Phillipe a better education because he had better economic resources as a doctor, whereas Francine was only a nurse, and he could provide a better cultural environment and total routine. Olivo wanted custody because he wanted to put the child on a regular diet. It was also very important for Phillipe to have a strong male influence; being raised by his mother would make him feminine. He needed a man to bring him up to be a man. He allowed Phillipe to stay up late at night because it is hard to regulate the child when the mother is around. Olivo told her that he had no need to discipline the child. When asked what he did for Phillipe when he was small, Olivo said this was the mother's job and that he worked.

Skully further testified she found the marital domicile neat and clean, except for the bedroom on the lower floor, which was cluttered. Francine had testified that room was occupied by Olivo, and other witnesses testified that it was cluttered with male clothing, among other things. Olivo denied that the room was his, but was extremely vague regarding where he slept; at one point he stated he slept on the floor in the living room. Skully observed Phillipe and Francine. They seemed to respond and listen to each other and Francine spoke softly to Phillipe. Phillipe's babysitter told Skully that Olivo let him play with matches, and on one occasion fed him four packages of candy in one day.

In Skully's opinion, it was in the child's best interest for Francine to have custody. She found it unusual that Olivo supported his reason for wanting custody with newspaper articles about complete strangers, his admission of physical violence concerned her, and she felt that Olivo did not put enough limitations on Phillipe.

Susan Jairado, a registered nurse and social acquaintance of Francine's, testified on Francine's behalf. Francine kept the house neat and took good care of Phillipe. She reiterated Francine's method of disciplining Phillipe as Francine herself described it. She testified she had seen Phillipe play with dangerous toys such as a sling shot and an arrow, and that she had seen Francine put such toys out of his reach. Another friend of Francine's, Rosvita Guzaski, testified that she and her children had engaged in activities with Francine and Phillipe such as attending church, playing games, roller skating and swimming. She stated that on one occasion she observed Olivo pass on the street in a pick-up truck with Phillipe riding in the back unattended.

Olivo testified that he was a staff cardiologist at South Chicago Com-

munity Hospital. He made rounds at the hospital everyday, maintained his own private office four days a week, and was on call 24 hours a day. He had two children by a prior marriage living in the Philippines. He had sent no money to the children's mother, Rachel. Although he was "made to believe" the children were living with his ex-mother-in-law, he had not sent her any money for the support of the children. He sent money directly to the children; however, at his deposition he said that the children were too young to take money. He had not seen them for seven to nine years. He arrived home on Mondays, Tuesdays, Thursdays and Fridays at approximately 4-5 p.m., rather than between 8 p.m. and 12 a.m., as Francine testified. Sometimes he went out again so that Phillipe would not see the tension between himself and Francine. Francine had attempted to minimize his contact with Phillipe. At another point, however, he testified there was no friction between himself and Francine. He had changed Phillipe's diapers, fed him and cooked for him, but had not cooked for him lately.

Olivo admitted he did not know who took Phillipe to school or brought him home, or the name of his babysitter, whom he calls "the old lady next door." He bought toys for Phillipe everyday, and sometimes gave him one in the morning and one in the evening. He disciplined Phillipe "by example." He never says "no" to him, but takes a more positive approach. Francine disciplined in a threatening way. On one occasion Phillipe told him his mother hit him, and Olivo found bruises on his face. He would be a better custodian of Phillipe because he could better care for Phillipe's physical well-being, growth and development. For example, he chose Phillipe's pediatrician and dentist; however, Francine takes Phillipe to see them. He also feels he can give Phillipe psychological consistency. Phillipe should be taught stability "by example." He would give Phillipe intellectual guidance, as he had done in the past by taking him to see "Snow White and the Seven Dwarfs" and to a farm to see how an egg is laid. He had never consulted with Phillipe's teachers and did not know their names, although he had a list of them at home. Olivo would be able to give the child spiritual leadership because of the Catholic background of his country. He had taken Phillipe to church once in the last year, and about four or five times in the past two years. He did not know whether Phillipe went to church regularly with his mother or not. He should get custody because he had more money and he would be willing to give the child what he needed. He has not taught the child any anatomy; sex education should be taught again "by example." With regard to the physical aspects of the child's sex education, he stated, "I will teach him how to screw somebody if you want me to." If he received custody he would hire up to four full-time nannies to take care of Phillipe.

Ideally, he would like Francine to take care of Phillipe for three or four days a week. Olivo claimed that Francine drinks, and has been intoxicated in his presence three or four times per year.

Eugene Citadino testified on Olivo's behalf that he had known Olivo for four years. Olivo brought Phillipe to his house two or three times a month. They played games with Phillipe and he would swim in the pool. Olivo disciplined Phillipe by talking to him and without yelling or hitting him. Citadino saw warm affection between them.

During closing argument, Arthur M. Berman, representative of the minor child, stated that Francine and Olivo were fit parents. He stated that "[i]f the court believes that everything is equal, I would recommend custody be given to Mrs. Leopando primarily because of her current relationship with the child, but only if the court makes it perfectly clear to her that the child is not a chattel to be taken to Florida just because she may choose a particular way of life." He added that if the court believed Olivo, custody should be awarded to him without fear for the child's health or safety.

On February 4, 1981, the court orally awarded custody to Olivo. The court gave no reason for its decision, but declared it took into consideration the factors found in section 602 of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1979, ch. 40, par. 602.) The court stated that both parties were fit and proper to have custody. A written judgment for permanent custody was entered December 15, 1981.

## I

■■ We first address the contention by the representative of Phillipe at oral argument of this appeal, who had never been served with notice of its filing. He makes the argument that upon the filing of his appearance after appointment by the circuit court, he was entitled to receive notice of all trial and post-trial proceedings affecting his assignment as representative of the minor around whom the custody issue revolves. Counsel for Francine concedes that no notice of filing notice of appeal was ever served upon said representative, but claims that nothing in the law or rules requires that he serve notice upon a non-party or his counsel or representative in custody proceedings. We disagree. An examination of Supreme Court Rule 303(d) (73 Ill. 2d R. 303(d)) reveals that notice of filing notice of appeal is required to be served upon "* * * every other party and upon *any other person or officer entitled by law* to notice of appeal." (Emphasis added.) In a custody proceeding, it is difficult to conceive of one more entitled to notice of trial or post-trial proceedings affecting such custody than the minor child or children and their representatives. (See *Roth v. Roth* (1977), 52 Ill. App. 3d 220, 226-27, 367 N.E.2d 442.) This is not to suggest that such representative should necessarily seek interven-

tion in every appeal; however, he should be given the opportunity of determining whether that step would be necessary in order to safeguard and preserve the rights of the subject minor children. Although absence of notice does not affect our jurisdiction to consider the appeal (*Lachona v. Industrial Com.* (1981), 87 Ill. 2d 208, 211, 429 N.E.2d 858; *Echols v. Olsen* (1976), 63 Ill. 2d 270, 274-75, 347 N.E.2d 720), the better procedure here would have been to have notified said minor through his duly court-appointed representative. Since the representative sought no leave to intervene in the appeal or to file a brief, we proceed to the merits of the appeal.

## II

Francine argues that the trial court abused its discretion in awarding custody to Olivo because the evidence demonstrates that she has a close, full-time daily involvement with Phillipe and that she takes an active interest in his life, whereas Olivo has only a passive interest in Phillipe, knows little about the day-to-day details of his life, is rarely at home, and shows interest in Phillipe primarily by giving him toys and candy. Francine further contends that Olivo's repeated characterization of his guidance of Phillipe as "by example" is meaningless and empty. He does not know who takes Phillipe to and from school, who his teachers are, or his babysitter's name. She claims further that Olivo is careless of Phillipe's safety in giving him dangerous toys and allowing him to ride on the back of a pick-up truck unattended.

■■ The primary consideration before the trial court in a child custody case is the welfare and best interests of the child. (*People ex rel. Morris v. Morris* (1969), 44 Ill. 2d 66, 68, 254 N.E.2d 478; *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647.) In awarding custody of a child, the trial court has broad discretion; however, such discretion is not unlimited, is subject to review, and when the award is contrary to the manifest weight of the evidence, it is the duty of a reviewing court to reverse that decision. *Applegate v. Applegate* (1980), 80 Ill. App. 3d 81, 84-85, 399 N.E.2d 330; *Soldner v. Soldner* (1979), 69 Ill. App. 3d 97, 103, 386 N.E.2d 1153; *Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 22, 366 N.E.2d 87.

The evidence in the instant case, detailed above, overwhelmingly supports Francine's contention that she should have been awarded custody of Phillipe. That evidence revealed that she had devoted full time to and took an active interest in every facet of the child's upbringing. Detailed accounts of Francine's intimate and daily involvement with Phillipe's life in contrast with the absence of such involvement by Olivo demonstrates that custody of Phillipe by Francine would have been in his best interest. Olivo planned to secure the services of full-time babysitters until he was able to arrive home, lacked knowledge concerning Phillipe's

daily educational, religious, social and physical activities, was ignorant of the child's personal habits, and anticipated separation from Phillipe for long periods of each day. These circumstances demonstrate a similarity with those that existed in *In re Marriage of Farris* (1979), 69 Ill. App. 3d 1042, 388 N.E.2d 232. There the court noted evidence of the mother's inability to devote sufficient time to the children as one of the principal bases for its decision. As well, in *Applegate v. Applegate,* one of the principal reasons given for the reviewing court's decision was the mother's inability to care for the children properly because of her employment and observed that the children would spend more time with the baby-sitter than they would with the putative custodial parent. (80 Ill. App. 3d 81, 85.) Here Olivo is engaged in a busy medical practice, and his ability to be in close contact with the child is seriously undermined.

■■ A trial court possesses a superior vantage point in reaching its decision, having had the opportunity to observe the parents and the child as well as to assess and evaluate their temperaments, personalities and capabilities. (*Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 24; *Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 407, 320 N.E.2d 581.) Our analysis of the entire record and of the briefs compel us to conclude, however, that the order awarding custody to Olivo is contrary to the manifest weight of the evidence and its enforcement would be contrary to the welfare and best interests of the child.

Accordingly, the order appealed from is reversed and the cause remanded to the trial court for the purpose of returning custody to Francine on a permanent basis and to establish reasonable rights of visitation by Olivo.

Reversed and remanded.

STAMOS, P. J., and DOWNING, J., concur.