*In re* MARRIAGE OF SALVATORE MACALUSO, Petitioner-Appellee, and PAOLA MACALUSO, Respondent-Appellant.

Second District   No. 82—148

Opinion filed December 2, 1982.

Peter M. Donat, of Donat & Donat, of Batavia, for appellant.

Stephen M. Cooper, of Geneva, and Melvin E. Dunn, Ltd., of Elburn, for appellee.

JUSTICE HOPF delivered the opinion of the court:

Respondent, Paola Macaluso (Paola), appeals from an order of the trial court granting custody of Lisa Macaluso (Lisa), the minor child, to petitioner, Salvatore Macaluso (Sal), and from an order requiring Paola to pay $1,000 temporary attorney fees to Lisa's attorney for the prosecution of this appeal. Petitioner cross-appeals from an order of the trial court requiring him to pay $2,500 towards respondent's attorney fees.

In November of 1979, Paola took Lisa, aged five, to Italy to live with Paola's parents. The following month, Sal filed a petition for dissolution of marriage, and temporary custody was granted to him in December 1979. Sal went to Italy in December and returned with Lisa to the United States. Paola returned to the United States in April of 1980 and made an unsuccessful attempt to gain custody of Lisa.

In September of 1980, apparently fearing that his wife would attempt to return to Italy with Lisa, Sal quit his employment as a police officer for the Carpentersville police department and left the jurisdiction. He took Lisa to Arizona along with a woman named Darlene Kitsinger and her two children. While in Arizona the group lived together as a family in a three-bedroom house and all of the children attended school. In the meantime, temporary custody of Lisa was awarded to Paola. In January of 1981 Sal returned to Illinois and Lisa was placed in the custody of the Department of Children and Family Services. An attorney was appointed to represent the child, and he supervised visitation by the parents until May of 1981.

On September 27, 1981, the court interviewed Lisa Macaluso in chambers with the attorneys for all parties present. Lisa stated that she was going to school in Wisconsin where she had playmates and that she liked it there. She said she had been "going around the world" with her father and that it was making her "seasick." Lisa

said she wanted to stay in this country and in one place. She said that they treated her "like a pig" in Italy and that Paola made her "sit in a chair all day." She said she "kind of" loved her grandmother and grandfather in Italy but that she did not think that they loved her. Lisa said she did not like living in Arizona but that she missed Darlene's two sons. She did not miss Darlene because Darlene was "too big for her." Prior to the interview, Lisa met her mother in the hallway and told her to "get away" because she believed Paola wanted to grab her and take her to Italy. She said her mother was "not really the best Mommy that I have." She said that she got along with her father "easy," and that he never did anything to scare her. She said that her father drinks whiskey sometimes, but when he drinks he acts "like himself."

At the subsequent custody hearing, Paola Macaluso testified that she lived in a townhouse in Park Forest, Illinois, that she had been employed since December 15, 1980, and that she earned $750 a month net. She stated she worked six days a week, but if granted custody of Lisa she would work only five days a week if she remained in the United States. She testified, however, that she believed it would be best to return to Italy with Lisa to live with her family. Paola testified that there would be no problem with transportation for Lisa to visit her father since her family was wealthy and would provide funds. If, on the other hand, the court ordered her to keep Lisa in the United States, Paola testified that she would do so. She and Lisa would live in the rented townhouse in Park Forest which had two bedrooms and which was near schools. Paola testified that friends she had made through Al-Anon, an alcohol counseling service, would stay with Lisa while she worked. She did not know the last names of any of these friends, nor the names of any of her neighbors in Park Forest.

Paola testified that she believed her husband was an alcoholic. She recounted instances of his drinking which had allegedly culminated in violence, including one instance in which she went to the Elgin Crisis Center with Lisa but returned home with her husband the next day. On cross-examination she testified that Sal was a wonderful father but a terrible husband, and that Lisa and her father had a good relationship.

It was stipulated that Sal was employed part-time at a 7-11 store, but that he was scheduled to begin work for Illinois Pools Unlimited as soon as custody proceedings were completed. His gross salary would be $350 per week in the summer and $12,000 annually, plus commission, when the construction period ended. He had also applied to police departments for reemployment.

Sal testified that he had recently married Darlene Kitsinger and was living with her and her two young sons, ages six and eight, in a home that Darlene owned in Buffalo Grove. He testified that he drank socially and did not believe he had a drinking problem. He stated that he had slapped his wife twice in the course of their marriage. Once following a heated argument he had slapped her and she took Lisa to the Elgin Crisis Center overnight. He testified that he had slapped Paola to stop her constant arguments and that he had taken Lisa to Arizona because of his wife's threats to return to Italy with Lisa regardless of court orders. He and Darlene and their three children had remained in Arizona for approximately 40 days and they told Lisa and the other children that he and Darlene had been married shortly after they arrived. He stated that basically they lived in Arizona as a family and that the children all attended school.

Darlene Macaluso testified that if Sal received custody of Lisa she would live with them in Buffalo Grove and attend school with Darlene's two boys. Lisa would have her own bedroom. There were two playgrounds, a pool and a recreation center near the home. Darlene stated that her sons and Lisa got along very well and referred to each other as brothers and sister. She stated that although both she and Sal were drinking more than they normally did while in Arizona, she never saw him intoxicated. While in Arizona they went to church every Sunday and the children attended religious instruction classes. This would continue once they were all settled in the Buffalo Grove home. She stated that Sal and Lisa had the "best father and child relationship" she had ever seen and that Sal did school work every night with all three children in Arizona. She stated she was employed as a dental assistant and receptionist five days a week, but that as soon as Sal could support the family she planned to resign to stay home with the children. She testified that she had never seen Sal threaten or strike anyone and that her children loved him very much. She testified that she had contacted her boys' school regarding Lisa's enrollment and had observed the classroom and knew the teachers that Lisa would have. She had also discussed Lisa's enrollment with the school counselor and assistant principal.

Five other witnesses testified for Mr. Macaluso. Two former neighbors of the Macaluso's testified that although Paola had a good relationship with Lisa, Sal's relationship with Lisa was exceptional. They believed Sal should have custody of Lisa. These witnesses, as well as three members of the Carpentersville police department, testified that Sal did not have a drinking problem.

The testimony of Jerry Lee Cox, Lisa's foster mother since Jan-

uary of 1981, was entered by stipulation. She stated that although Lisa was originally fearful of her mother and of being removed to Italy, the relationship had healed and Lisa had now expressed love for both parents. Ms. Cox testified that, although her normal preference for custody of a child of Lisa's age and sex would be the mother, due to Lisa's unique relationship with her father, Ms. Cox believed custody should be given to Sal.

Counsel for Lisa Macaluso stated in closing argument that based on his supervision of over 50 hours of visitation between Lisa and both of her parents, he believed custody should be awarded to the father.

On May 4, 1981, an order was entered awarding custody to Sal and reserving other issues. On July 1, 1981, an order was entered directing Lisa's attorney to continue to represent Lisa on appeal and ordering Paola to pay Lisa's attorney $1,000 temporary fees on appeal with further fees or reimbursement to be subject to order of the appellate court. Paola originally appealed the custody order on June 3, 1981, which appeal was dismissed on September 1, 1981. A judgment for dissolution of marriage was entered on January 12, 1982, granting Mr. Macaluso's petition for dissolution based on mental cruelty, awarding custody of Lisa to Mr. Macaluso, and requiring him to pay $2,500 attorney fees to the attorney for Paola.

Respondent first contends that the trial court erred in granting custody of Lisa to her father. She argues that the custody award is against the manifest weight of the evidence.

Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602) codifies the established guiding principle for determining custody, the child's "best interest." This section provides:

> "(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:
>
> (1) the wishes of the child's parent or parents as to his custody;
>
> (2) the wishes of the child as to his custodian;
>
> (3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;
>
> (4) the child's adjustment to his home, school and community;
>
> (5) the mental and physical health of all individuals involved; and

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person but witnessed by the child.

(b) The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child."

The court must evaluate the circumstances and determine the witnesses' credibility. It is not necessary to find one parent unfit in order to justify an award to another. (*In re Marriage of Milovich* (1982), 105 Ill. App. 3d 596, 434 N.E.2d 811.) Illinois courts no longer presume that the mother is necessarily the better custodian for young children. (105 Ill. App. 3d 596, 607, 434 N.E.2d 811, 820; see *In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 396 N.E.2d 1214; *Jines v. Jines* (1978), 63 Ill. App. 3d 564, 380 N.E.2d 440.) The trial court has broad discretion in awarding custody and there is a " 'strong and compelling' " presumption in its favor. (*In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 244, 430 N.E.2d 716, 718, quoting *Gren v. Gren* (1978), 59 Ill. App. 3d 624, 626, 375 N.E.2d 999.) Consequently, a court of review will not overturn the trial court's determination unless the judgment is against the manifest weight of the evidence or is manifestly unjust. *In re Marriage of Milovich; In re Marriage of Mitchell.*

■ In the case at bar, it cannot be said that the decision granting custody to the husband is against the manifest weight of the evidence. Mr. Macaluso offered Lisa her own room in a three-bedroom home owned by his new wife. Lisa would also have two stepbrothers living in the home with whom she has a good relationship, and her stepmother would remain at home to care for all of the children. Further, Mr. Macaluso and his wife have many relatives in the immediate vicinity who might add to a stable home environment for Lisa. Sal was scheduled to begin work for Illinois Pools Unlimited as soon as custody proceedings were completed. His gross salary in the summer months will be $1,400 per month, and when the construction period ends he will earn $12,000 annually, plus commissions. He has also applied to police departments for reemployment. In contrast, Paola desired to return with Lisa to Italy to live with her parents despite Lisa's desires to remain in this country. However, Paola testified that if ordered to remain in the United States, she would do so and she and Lisa would live in the rented, sparsely furnished townhome in Park Forest, Illinois. Paola has no relatives in the United States. Although she stated that friends whom she met through Al-Anon would provide

day-care for Lisa, she knew these friends only by their first names. It is evident from the testimony that Mr. Macaluso offered a more stable home environment which Lisa seems to require. Further, all of the witnesses who testified regarding Lisa's relationship with her parents expressed the opinion that her relationship with her father was unique and exceptional. Even Paola conceded that Mr. Macaluso and Lisa "have a very close father-daughter relationship." All of these witnesses, with the exception of Paola, agreed that it was in Lisa's best interest to be placed in the custody of her father.

Respondent argues that the father instilled fear of her mother in Lisa resulting in a strained relationship that improved only after a course of visitation while Lisa was in the care of her foster mother. However, it is equally likely that Lisa was understandably frightened of her mother because of her mother's prior flight with Lisa to Italy where she was treated, in the child's words, "like a pig." Respondent also claims that the trial court did not give sufficient consideration to the "adulterous relationship" of Darlene and Sal, to which Lisa was subjected for about 40 days. The court here was aware of this "adulterous relationship." Despite this, the court apparently was convinced that the father, while he may have acted imprudently, had not engaged in conduct which had an adverse effect on the child. Further, we consider that Sal's subsequent marriage to Darlene sufficiently eliminated any question *vis-a-vis Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 400 N.E.2d 421. (*In re Custody of Saloga* (1981), 96 Ill. App. 3d 661, 421 N.E.2d 991; *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540, 396 N.E.2d 87.) We, therefore, are of the opinion that the order of the trial court granting custody to Sal was not against the manifest weight of the evidence.

■ Respondent next contends that the court erred in ordering Paola to pay $1,000 in temporary attorney fees to Lisa's attorney for the prosecution of this appeal. She asserts that section 506 of the Illinois Marriage and Dissolution of Marriage Act does not authorize prospective attorney fees. We agree.

It is generally held that a trial court cannot award attorney fees pending appeal in the absence of specific statutory authority. (*Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 408 N.E.2d 441; *Fox v. Fox* (1978), 56 Ill. App. 3d 446, 371 N.E.2d 1254; *Zalduendo v. Zalduendo* (1977), 45 Ill. App. 3d 849, 360 N.E.2d 386; *Arndt v. Arndt* (1948), 399 Ill. 490, 78 N.E.2d 272.) The Illinois Marriage and Dissolution of Marriage Act, section 506 (Ill. Rev. Stat. 1979, ch. 40, par. 506), states:

"The court may appoint an attorney to represent the interests

of a minor or dependent child with respect to his support, custody and visitation. The court shall enter an order for costs, fees and disbursements in favor of the child's attorney. The order shall be made against either or both parents, or against the child's separate estate."

Although section 506 does allow for an award of attorney fees in favor of the child's attorney, it does not specifically authorize the award of such fees during the pendency of an appeal. (*Cf. In re Marriage of Giammerino* (1981), 94 Ill. App. 3d 1058, 419 N.E.2d 598.) We, therefore, hold that the trial court erred in directing respondent to pay prospective attorney fees under this section.

■ On cross-appeal, petitioner challenges the trial court's order requiring him to pay a portion of Paola's attorney fees pursuant to section 508(a) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 508(a)). It should be noted that respondent has not filed a reply brief and, therefore, has not addressed this issue.

An award of attorney fees requires consideration of the financial resources of the parties, and is left to the sound discretion of the trial court, reversible only for an abuse of discretion. (*Robinson v. Robinson* (1981), 100 Ill. App. 3d 437, 450, 429 N.E.2d 183, 192.) Such an award under section 508 of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 508) is justified when the party seeking relief demonstrates financial inability to pay coupled with the ability of the former spouse to do so. (*In re Support of Burks* (1981), 100 Ill. App. 3d 700, 705, 427 N.E.2d 353, 357.) An allowance of fees is never automatic and is not mandated simply by a showing that one spouse has a slightly greater ability to pay the fees. (*Coons v. Wilder* (1981), 93 Ill. App. 3d 127, 135, 416 N.E.2d 785,793.) However, "financial inability" for purposes of awarding attorney fees in a divorce proceeding exists where payment of fees would strip the individual of his or her means of support and undermine his or her economic stability. (*In re Marriage of Kolb* (1981), 99 Ill. App. 3d 895, 425 N.E.2d 1301; *In re Marriage of Cleveland* (1981), 99 Ill. App. 3d 293, 425 N.E.2d 475.) Financial inability does not necessarily mean that the party would be destitute as a result of paying his or her own fees. *In re Marriage of Scott* (1980), 85 Ill. App. 3d 773, 407 N.E.2d 1045.

Although the trial court conducted a hearing on the issue of attorney fees on May 22, 1981, a transcript of those proceedings is not a part of the record on appeal. Thus, the only information on this subject is what we have been able to glean from the testimony of the parties throughout the trial, as well as the order of the court contained

in the common law record. The order states that arguments of counsel were heard and that the court was "fully advised in the premises." It is well-settled that it is the duty of the appellant (or cross-appellant as the case may be) to present a complete record on appeal so that the reviewing court will be fully informed regarding the issues in the case. (*Brokerage Resources, Inc. v. Jordan* (1980), 80 Ill. App. 3d 605, 400 N.E.2d 77.) Any doubt arising from the incompleteness of the record must be resolved against the appellant. (*In re Estate of McGaughey* (1978), 60 Ill. App. 3d 150, 376 N.E.2d 259.) In the absence of a report of proceedings, particularly when the judgment order states that the court is fully advised in the premises, a reviewing court "will indulge in every reasonable presumption favorable to judgment, order or ruling from which an appeal is taken" (*In re Pyles* (1978), 56 Ill. App. 3d 955, 957, 372 N.E.2d 1139, 1141) and must presume that the evidence heard by the trial court was sufficient to support the judgment absent any contrary indication in the record. *Brokerage Resources, Inc. v. Jordan.*

There is nothing in the record to indicate that the evidence was not sufficient to support the judgment. Respondent's projected annual salary was estimated at $9,000. She further received $15,000 representing 50% of the marital property. There is no indication in the record of the total amount expended in attorney fees; there is only an indication that 74 hours of legal time had accumulated. Moreover, there is no indication of Paola's liabilities or of the expenditures necessary to adequately support herself. The record does reflect, however, that she was renting a townhouse which was sparsely furnished because of a lack of funds. We can only presume that the court considered these factors in its award of attorney fees.

On the other hand, petitioner's projected annual income was $16,200. This amount does not include the salary which he was earning from his job at a 7-11 store, nor the commissions he will earn at Pools Unlimited. In addition, Mr. Macaluso apparently received another estimated $11,000 from the division of the marital property. It is further evident from the record that petitioner's new wife, Darlene, provided an additional source of income from her job as a dental assistant. Darlene also owns the home in which Sal lives, eliminating monthly rental payments, and there is no indication in the record that monthly mortgage payments will be necessary. Therefore, on the basis of the record before us, we must presume that the evidence was sufficient to establish Paola's financial inability to pay the full amount expended in attorney fees, as well as Sal's ability to do so. *Brokerage Resources, Inc. v. Jordan* (1980), 80 Ill. App. 3d 605, 400 N.E.2d 77;

*Reace v. Reace* (1976), 39 Ill. App. 3d 496, 350 N.E.2d 143.

For the foregoing reasons, the order of the trial court awarding custody of the minor child to the father is affirmed, as is the order directing petitioner to contribute to the attorney fees charged by respondent's attorney. The order directing respondent to pay prospective attorney fees to the attorney of the minor child for the prosecution of this appeal is reversed.

Affirmed in part; reversed in part.

SEIDENFELD, P.J., and NASH, J., concur.