*In re* MARRIAGE OF SHAWN MARIE STUART, Petitioner and Counter-respondent-Appellee, and RICHARD LEE STUART, Respondent and Counterpetitioner-Appellant.

Fifth District   No. 5—85—0244

Opinion filed March 5, 1986.

John S. Weiner and Robert Weiner, both of Springfield, for appellant.

Hal Alexander, of Taylorville, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Respondent-counterpetitioner, Richard Lee Stuart (hereinafter referred to as respondent) appeals from an amended judgment of dissolution of marriage entered by the circuit court of Christian County. That judgment granted permanent custody of the parties' two minor children to petitioner-counterrespondent, Shawn Marie Stuart (hereinafter referred to as petitioner). Respondent asserts that the trial court erred in amending its original judgment, under which he was given custody of the children, and that the amended judgment is not supported by the evidence. For the reasons which follow, we affirm.

Respondent and petitioner were married on October 11, 1980. Their first child, Jacob, was born on July 27, 1981. Their second child, Jenni, was born September 21, 1982. From the time of Jacob's birth to the time of trial, with the exception of a one-month period in 1984, petitioner was unemployed and was engaged full time in the care of the parties' children. During this same period, she was the sole or primary care provider for the children.

Petitioner and respondent separated on or about May 20, 1984. At this time, they resided in Mechanicsburg. Petitioner filed her petition for dissolution of marriage of May 24, 1984, and was granted an *ex*

*parte* order of protection directing delivery of the children to her custody. A petition for temporary custody was subsequently filed by petitioner on June 1, 1984. Respondent objected to that petition, opposed extension of the *ex parte* protective order, and filed a counterpetition for dissolution of marriage on June 4, 1984. A hearing on the temporary custody petition was held on June 25 and 26, 1984, after which the trial court granted temporary custody to petitioner, with visitation rights to respondent.

On February 7, 1985, following a succession of evidentiary hearings, the trial court entered a written judgment of dissolution of marriage, finding both parents fit, but awarding permanent custody to respondent. On February 26, 1985, petitioner filed a timely post-trial motion alleging numerous errors of law and fact. Arguments on the post-trial motion were heard the following day, and on March 1, 1985, the court amended its judgment with respect to child custody, support. and visitation. Under the amended judgment, permanent custody was granted to petitioner, subject to reasonable visitation by respondent. The court's final, written judgment, as amended, was entered on March 13, 1985. It is from this amended judgment that respondent now appeals.

■ Respondent suggests that the amended judgment was improper because the requirements of section 610 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 610) were not satisfied. That provision, however, is inapplicable. It pertains only in the case of the exercise of a court's extraordinary continuing jurisdiction to modify a final custody order when, due to changed circumstances, the childrens' best interests require modification. (*In re Marriage of Herron* (1979), 74 Ill. App. 3d 748, 753, 393 N.E.2d 1153, 1156.) Nothing in section 610 restricts the power of the court to vacate or revise a final judgment upon a timely post-trial motion of a party, pursuant to section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1203), on grounds not peculiar to child custody cases. *In re Marriage of Herron* (1979), 74 Ill. App. 3d 748, 753, 393 N.E.2d 1153, 1156.

Under section 2—1203, any party may, within 30 days after the entry of judgment, file "a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief." (Ill. Rev. Stat. 1983, ch. 110, par. 2—1203.) The purpose of such post-trial motions is to alert the trial court to errors it has committed and thereby afford it an opportunity for their correction. (See *Page v. Estate of Page* (1978), 66 Ill. App. 3d 214, 217, 383 N.E.2d 615, 618.) The power to grant the motion rests in the sole discretion of the trial court.

*In re Marriage of Parello* (1980), 87 Ill. App. 3d 926, 931, 409 N.E.2d 461, 465.

There is no dispute that petitioner's post-trial motion was filed within the 30-day period specified by section 2—1203 and that the relief requested was authorized by that provision. Respondent nevertheless argues that the trial court should not have amended its judgment because no "new or changed evidence" was presented at the post-trial hearing. This contention is wholly without merit. Newly discovered evidence is one basis upon which a post-trial motion may be granted (see *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 775, 467 N.E.2d 962, 968), but it is by no means the exclusive basis for granting such a motion. The trial court may act on *any error* which it perceives must be remedied in order to do justice between the parties. *In re Marriage of Parello* (1980), 87 Ill. App. 3d 926, 932, 409 N.E.2d 461, 465.

■ At oral argument respondent's attorney asserted that the trial court was required by Illinois law to set forth the reasons for its amendment of the judgment. No authority is cited for this proposition, and our independent research has disclosed none. Respondent similarly argues that the amendment of the judgment without a showing of new evidence and without findings by the court of the rationale for the change contravened his rights to due process and equal protection under the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV). Respondent relies solely on *Weinberger v. Wiesenfeld* (1975), 420 U.S. 636, 43 L. Ed. 2d 514, 95 S. Ct. 1225, and *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, but those cases are inapposite. *Weinberger v. Wiesenfeld* (1975), 420 U.S. 636, 43 L. Ed. 2d 514, 95 S. Ct. 1225, involved a challenge to section 202(g) of the Social Security Act as amended (42 U.S.C. sec. 402(g)), under which benefits based on the earnings of a deceased husband and father covered by the Act were payable, with some limitations, both to the widow and to the couple's minor children in her care, while benefits based on the earnings of a deceased wife and mother covered by the Act were payable only to the minor children and not to the widower. *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, held that an unwed father of illegitimate children, like other parents, was entitled to a hearing on his fitness before the children could be removed from his custody. We find nothing in either decision which would render the action by the trial court here constitutionally infirm.

■ Respondent next argues that the trial court's amended judgment, granting custody to petitioner, was contrary to the evidence. We disagree. The primary consideration in determining custody is the best

interest and welfare of the child. (*In re Custody of Piccirilli* (1980), 88 Ill. App. 3d 621, 625, 410 N.E.2d 1086, 1090.) In determining the best interest of the child, the court must consider the particular facts and circumstances of each case. (*Lloyd v. Lloyd* (1980), 92 Ill. App. 3d 124, 126, 415 N.E.2d 1105, 1107.) It is not necessary to find one parent unfit in order to justify an award to another. (*In re Marriage of Macaluso* (1982), 110 Ill. App. 3d 838, 843, 443 N.E.2d 1, 4.) The trial court has broad discretion in awarding custody, and there is a strong and compelling presumption in its favor. (110 Ill. App. 3d 838, 843, 443 N.E.2d 1, 5.) This is because the trial court has the superior opportunity to observe the witnesses and evaluate the evidence. (*In re Custody of Piccirilli* (1980), 88 Ill. App. 3d 621, 626, 410 N.E.2d 1086, 1090.) Consequently, a court of review will not overturn a trial court's determination of custody unless the judgment is against the manifest weight of the evidence or is manifestly unjust. *In re Marriage of Macaluso* (1982), 110 Ill. App. 3d 838, 843, 443 N.E.2d 1, 5.

■ On the record before us we cannot say that the amended judgment granting custody to petitioner is against the manifest weight of the evidence. The children, aged 2 and 3 at the time of trial, were not examined regarding their wishes as to custody. Both parents, of course, wanted custody and were found to be fit. There was no evidence that the parents or the children suffered from any physical or emotional disabilities. Respondent cites numerous instances of neglect, abuse and moral indiscretion by petitioner; however, many of the examples were drawn from the record of the temporary custody proceeding, not the trial. Respondent moved to have the transcript of the temporary custody hearing adduced into evidence, but the trial court denied his motion, and respondent raises no objection to this ruling on appeal. Moreover, the conduct of respondent, himself, is not unblemished.

For example, evidence showed that petitioner could be emotional, even hot-tempered, and that on the day after the parties separated, petitioner observed respondent in a truck near their bank and drove her car into the rear of that truck, knocking it sideways. She then got out of her car, yelling and screaming, and police were called to the scene. The evidence also showed, however, that on the previous day, respondent had walked out on petitioner, without telling her where he was going, and did not return. Petitioner attempted to locate respondent, but was unable to do so. Both children were sick, and one, Jacob, had to be taken to the hospital emergency room by petitioner earlier in the day for treatment. That night petitioner was left to care for the children alone in the parties' house trailer, which had no electricity be-

cause all of the fuses had blown and there were no replacements. Petitioner testified that she was upset with respondent, precipitating the incident near the bank, because of this.

On the day of the parties' separation, petitioner and respondent had an argument at their home. During the course of this argument, petitioner went into the kitchen with one of the children in her arms, picked up a knife, and pointed it at respondent. Respondent testified that she held the knife "just like you would point your finger at somebody and tell them something." He stated that he was not in fear of her, nor was he afraid for the child.

The following day, after respondent had left, petitioner took the children to respondent's mother's house while she went out. When she returned, no one was there. She subsequently contacted respondent's mother and sister, but was unable to locate the children and did not see them for three days thereafter. Respondent testified that after the incident near the bank, he had taken the children from his mother's to his sister's, then to the Holiday Inn in Decatur for one night and to the Best Western Motel in Decatur the following night. Respondent admitted that he directed his mother and sister not to disclose to petitioner where he and the children were. Petitioner made arrangements for respondent to pick up Jacob's medicine, but he did not do so. Respondent was aware that the children were sick, but did not take them to a doctor until May 23, and did not purchase the prescribed medication until May 24.

Respondent's mother testified that respondent and petitioner lived in her home between August and December of 1983. She believed that petitioner did not feed the children properly, and stated that she had once seen a mark on Jacob's ear and teeth marks where petitioner had allegedly bitten him to "get him to quit biting Jenni." On cross-examination, however, she admitted that she had not seen petitioner bite Jacob or strike either of the children. Respondent confirmed having seen bite marks on the children, but believed the bites were inflicted by the children on one another.

Neighbors of the parties indicated that petitioner would sometimes allow the children to play outdoors in cold weather with inadequate clothing and bare feet. Respondent charged that petitioner did not adequately supervise the children when were in the bathtub. On one occasion Jacob fell in the tub, scratching his back on the soap dish. On another, after this litigation commenced, Jenni kicked Jacob, giving him a black eye. Petitioner denies having left the children unattended in the bathroom. The Department of Children and Family Services made an investigation regarding Jacob's black eye, having received a

complaint from respondent's mother. That investigation determined that the reports of child abuse by petitioner were unfounded.

Petitioner made corresponding allegations regarding respondent's conduct. She stated that on one visitation with respondent after the separation, Jacob cut himself with a plastic knife. Respondent admitted that he was present when Jacob had the knife, but claimed that Jacob merely hit himself in the eye with it and did not cut himself. Respondent further acknowledged that prior to the separation, he gave Jacob the keys to his truck. Jacob got into the vehicle alone, managed to get it moving, and collided with another vehicle. Respondent later stated that the keys were already in the truck when this accident occurred.

Petitioner testified that she agreed to permit visitation of the children by respondent at times and on terms not required by court order. On one occasion, respondent returned the children three hours late after an overnight visit. Respondent admitted to regularly returning the children five, 10 or 15 minutes late. After the separation, respondent refused to give petitioner information regarding his health insurance, although the children were covered by it. During the separation respondent also refused to give the children's winter clothing to petitioner until an oral motion of counsel in early November 1984 secured an agreement by respondent's attorney to see that the clothing was turned over. Petitioner reported that in the fall of 1984 Jacob had begun to have nightmares. He would wake up an average of once a night for approximately five minutes until petitioner would comfort him and he returned to sleep. On two occasions, when having these nightmares, Jacob was reported to have screamed, "No daddy. No daddy. No daddy."

The evidence showed that between January and May, 1984, a number of male friends would visit the parties' home. These were originally friends of respondent, but later became friends of petitioner. Petitioner became particularly close to a young man named Brad Houk. Houk would visit petitioner regularly, and the children were present when he and she were there together. On one occasion, when respondent was away, Houk apparently stayed at the home with petitioner late into the night, departing only after respondent returned unexpectedly. Another time, respondent awoke at midnight to find petitioner and Houk sitting on the living room couch together. A witness called by respondent stated that he was present at the home and saw petitioner and Houk kiss one another every day for four months.

Respondent, for his part, admitted that he began "going with" a woman named Tammy Jett in September 1984, three months after sep-

aration of the parties. He slept with her in the parties' home, although not when the children were there, and was living with her by early November 1984. Jett was present during respondent's visitation with the children and occasionally took care of the children in respondent's absence. Respondent stated that he planned to marry Jett in December 1984.

We have cited the foregoing evidence because it includes the most serious allegations exchanged between the parties in this acrimonious dispute. This evidence demonstrates that the conduct of both parties was, at times, far from exemplary. Other evidence showed, however, that each parent loved the children, knew how to care for them and, as the trial court found, would have been fit to raise them. What distinguishes petitioner from respondent is the significantly greater role she has played in the children's daily lives.

From Jacob's birth in July 1981 until January 1982, petitioner was the child's primary care provider, having stopped work to care for him. From January until April, 1982, petitioner was the sole care provider, respondent having gone to Mississippi to look for work. Petitioner and Jacob joined respondent in Mississippi, where they lived with petitioner's brother from April to July, 1982. Petitioner remained Jacob's sole care provider during respondent's work day, which, with travel time, extended from 3:30 or 4:30 a.m. to 6 p.m. From July to August, 1983, the parties lived in their own residence in Mississippi, and petitioner was again the sole care provider during respondent's work day, which was then 5:30 a.m. to 6 p.m. During petitioner's confinement for the birth of Jenni in September 1982, Jacob stayed with and was cared for by petitioner's brother and sister-in-law. Respondent did not visit Jacob because he was working.

The parties returned to Illinois and from August to December, 1983, lived with respondent's parents. Petitioner received some help with the children from respondent's mother, but otherwise was again sole or primary care provider. During this period, respondent worked 110 miles away and would stay overnight there two to three times a week. The parties moved into their own home, a house trailer, in January 1984. Between January and May, 1984, petitioner was the primary care provider, except for a one-month period in April, when she returned to work. The children were cared for by a babysitter the first two weeks of that month; for the remaining time respondent took care of them.

Petitioner has been the sole care provider for the children since the parties' separation in May 1984. During some visitation periods with respondent after the separation, the children were left by re-

spondent to stay with his parents. On two occasions the children remained at respondent's parents' house overnight. The evidence showed that at the time of trial respondent's working hours were 8 a.m. to 4:30 p.m. When asked what provisions he had made for taking care of the children during his work hours if he were awarded custody, respondent replied that "they can probably stay at my mom's during the day, or if my mom isn't available, my neighbor, Rita Cole, could watch them for me."

Harmony in and stability of the children's home life (see *Anderson v. Anderson* (1975), 32 Ill. App. 3d 869, 871, 336 N.E.2d 268, 270) and the relative ability of parents to devote sufficient time to the children (see *In re Marriage of Leopando* (1982), 106 Ill. App. 3d 444, 449-50, 435 N.E.2d 1312, 1317, *aff'd* (1983), 96 Ill. 2d 114, 449 N.E.2d 137) are important factors in resolution of custody disputes. As our review of the record has shown, petitioner is and always has been the principal parent, devoting full time to the task. Respondent, by contrast, has worked long hours away from home; been separated from his family, sometimes for protracted periods, because of his job; and will in the future be limited by his job in how much close contact he will be able to maintain with the children. Indeed, it appears that if custody were awarded to respondent, the children would spend as much of their waking hours with babysitters as with their father. Respondent should not, of course, be penalized for attempting to earn a living, but we must reemphasize that it is the children's best interests which are paramount. Under all of the circumstances present here, the children's best interests were served by the award of permanent custody to petitioner, and we cannot say that the amended judgment was contrary to the manifest weight of the evidence.

The trial court granted respondent reasonable visitation, including "overnight and weekend visitation on alternate weekends, and up to but not limited to two weeks of visitation taken consecutively or split during the course of each year." Respondent requests a more liberal visitation schedule, but we find no basis for disturbing the trial court's determination.

For the foregoing reasons, the amended judgment of dissolution of marriage entered by the circuit court of Christian County on March 13, 1985, is affirmed.

Affirmed.

JONES and WELCH, JJ., concur.