MICHELLE M. COOPER, Petitioner-Appellee, v. EDWARD L. COOPER, Respondent-Appellant.

Fifth District   No. 5—85—0488

Opinion filed August 27, 1986.

944

Crowder & Scoggins, Ltd., of Columbia, for appellant.

John R. Sprague, of Sprague, Sprague & Ysursa, of Belleville, for appellee.

JUSTICE HARRISON delivered the opinion of the court:
The marriage of petitioner, Michelle Cooper, and respondent, Edward Cooper, was dissolved by a judgment of the circuit court of St. Clair County. Respondent appeals contending the court erred (1) in awarding custody of the couple's only child to petitioner and (2) in failing to consider certain marital debts when it divided the marital property. We affirm.

Petitioner and respondent were married in October of 1976. Their only child, Jason, was born on September 20, 1979. Respondent left the marital home in November of 1984, taking Jason with him, after learning petitioner had become sexually involved with another man. Respondent and Jason moved into respondent's mother's home, where they were still residing at the time of the proceedings below. Respondent plans to move into a home of his own in the near future. Petitioner continues to reside in the family home.

In a temporary custody proceeding, the parties were awarded joint custody of Jason. In the final judgment, petitioner was awarded custody. Respondent contends this award of custody to petitioner was against the manifest weight of the evidence. He argues that the evidence shows petitioner is guilty of what he calls "promiscuous indiscretions," that petitioner has a poor relationship with Jason, and that Jason prefers to live with him.

In determining custody, the primary consideration is the best interest and welfare of the child. (*In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 317-18, 490 N.E.2d 243, 246.) Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 602) requires that the court consider all relevant factors, including those enumerated in the statute. We will not disturb the trial court's determination of custody unless it is against the manifest weight of the evidence or is manifestly unjust. *In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 318, 490 N.E.2d 243, 246.

In attempting to show custody should not have been awarded to petitioner, respondent points to petitioner's love affair with another man during the marriage. Petitioner admitted that she had been sexually involved with another man during her marriage to respondent.

She admitted to having sex with him twice, but testified none of these encounters occurred at her home or in the presence of Jason, and that Jason would have no way of knowing of this relationship unless he heard of it from respondent or others. Furthermore, petitioner testified her relationship with this man had ended.

■ Section 602(b) of the Act states: "The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child." (Ill. Rev. Stat. 1985, ch. 40, par. 602(b).) Our supreme court has held that there is no conclusive presumption that a child is harmed because a custodial parent cohabits with a member of the opposite sex. (*In re Marriage of Thompson* (1983), 96 Ill. 2d 67, 78, 449 N.E.2d 88, 93, *cert. denied* (1983), 464 U.S. 895, 78 L. Ed. 2d 232, 104 S. Ct. 242.) It would seem that there would be no presumption of any kind that the child has been harmed in the case of covert sexual encounters not amounting to cohabitation of which the child was unaware. See *In re Marriage of Smith* (1985), 132 Ill. App. 3d 694, 701, 479 N.E.2d 929, 933.

■ Respondent claims that Jason was in fact harmed by petitioner's actions. He testified that Jason told him "mommy and Mike was holding hands" in the park one day. Susan Owensby, a teenager who babysat Jason on occasion, testified that at times she would babysit Jason in the yard outside the family home while petitioner had a male guest come into the home. Susan testified that she and Jason were not allowed inside the home during the times the male guest was present. Despite this testimony, there was no evidence Jason understood the implications of these events. A psychologist, Dr. Michelle Ruffy, testified on behalf of respondent that if a parent is not consistent and honest about his or her moral behavior, a child can be adversely affected. However, she was unable to express any opinion regarding the effect of petitioner's conduct upon Jason, and admitted that a child of Jason's age may not be able to understand the nature of petitioner's relationship with her paramour. Because there is no presumption Jason was harmed by his mother's actions, and because there is no evidence of any actual harm to Jason, the trial court would have been correct in not considering this conduct.

Respondent, however, also points to evidence that during the marriage petitioner made sexual advances to a 15-year-old boy. The youth, Gary Kuepper, testified he was the president of a youth organization at his church while petitioner was the group's moderator. He stated that when petitioner went with the group to a movie, she sat next to him and was "hanging" on him, and her leg would touch his. He also recalled that she would slow dance with him during dancing lessons

sponsored by the group. Another specific incident occurred at a youth group outing at a swimming pool. Gary stated that petitioner, who was wearing a "skimpy" bikini, approached him and put ice down the front of his swimming suit, touching his penis as she did so.

Petitioner denied ever making sexual advances to Gary. She admitted she placed ice down his swimming suit, but stated that she placed it down the back of the suit and denied touching Gary's penis. Kevin Gordon, a Cahokia policeman who assisted the youth group and attended group functions, testified that he never saw petitioner do anything improper.

■ While petitioner's conduct can at best be classified as immature, and we do not condone it, respondent has failed to show how this conduct affected petitioner's relationship with Jason. The same is true of the evidence presented by respondent that petitioner was seen in public in seductive clothing. Peter Peskar testified that petitioner would watch ball games at a park near her home wearing "very revealing" clothes, such as hot pants. Petitioner denied ever dressing in a seductive manner, and testified she does not own any hot pants. She also presented two witnesses who testified they often saw petitioner at the park and that she never was dressed in a seductive manner. Even assuming this conduct in some indirect way affected Jason, it was but one factor to be considered by the trial court.

Respondent presented other evidence in an attempt to show petitioner would not be a proper custodian for Jason. Respondent testified petitioner is very short-tempered with Jason, and is more interested in keeping the house clean than in caring for the child. Respondent claimed that when petitioner was with Jason that the boy "wasn't allowed to go outside and get dirty like a normal child." Respondent stated that he observed petitioner washing off Jason with a hose outside in October after Jason had become dirty from playing in a pile of dirt. Respondent intervened and took Jason inside to give him a bath. Petitioner admits hosing Jason off, but says he was too dirty to go into the house and that the incident occurred on a summer evening. On another occasion, according to respondent, Jason was urinating in the yard after petitioner refused to allow him to use the bathroom inside. Respondent also testified that Jason hurt his eye while in the custody of petitioner, and that petitioner was remiss in failing to take him to the hospital for treatment. Respondent testified he took Jason for medical treatment when the boy was turned over to him for his period of custody. Petitioner countered this evidence by testifying that she called the hospital twice to get advice on what to do after Jason was injured, and was told it was not necessary for him

to go to the hospital. Respondent also testified that he provided much of the care for Jason. He often fed him, bathed him, played games with him, and took him on outings. Respondent stated that he often fixed breakfast for Jason because petitioner would stay up late at night and in the morning would not be interested in taking time to fix a good breakfast for the child.

Respondent's mother, Shirley Sampson, testified that petitioner was short-tempered. Sampson stated she once observed petitioner slap Jason on the mouth for eating candy after being told not to, and that petitioner then took Jason to the bathroom and when he came out his nose started bleeding. Petitioner denies this incident occurred. Sampson also stated that Jason told her, "mommy said dad might try to hurt us and kill us." Sampson also testified that Jason did not want to visit his mother when the time came for petitioner to take Jason.

Susan Owensby, the babysitter, testified that respondent had a good relationship with Jason, but that it was her view that petitioner has no patience with the child, and that she has seen petitioner slap Jason on his face on three separate occasions. Susan testified that on one of these occasions, Jason simply had asked his mother for something to drink, and his mother said "No" and slapped him. Petitioner denies ever slapping Jason. Another witness, Peter Peskar, who observed petitioner with her son at the park, stated that petitioner was not attentive to Jason when she attended ball games. However, Charles Ginosky, who worked at the park, and Connie Sanders, a friend of petitioner's, testified that petitioner always had a protective eye on Jason while at the park.

Dr. Ruffy, the psychologist, testified that respondent had brought Jason in for treatment for emotional problems related to the divorce, and that petitioner has not inquired about Jason's treatment. Dr. Ruffy found there to be a good relationship between respondent and Jason and that Jason should spend more time with his father than with his mother.

Respondent contends this evidence clearly shows petitioner is not a proper custodian for Jason. He also claims there is nothing in the evidence to attack his own qualifications as a father. However, it was not necessary for the court to find respondent unfit in order to justify an award of custody to petitioner. (*In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 318, 490 N.E.2d 243, 246.) Furthermore, petitioner argues there was evidence to show respondent was less than a perfect father. Petitioner testified regarding an incident which occurred after Jason returned from hockey practice. Petitioner testified that when respondent and Jason returned home, respondent called

the boy a "baby" for refusing to practice and began "yanking" Jason's hockey uniform off and told the boy he would sell the equipment. Petitioner testified that when she tried to stop respondent from taking off Jason's uniform, respondent pushed her out of the way. Respondent lives with his mother, Shirley Sampson. There is evidence that a man who is not Sampson's husband occasionally stays at the house. Sampson admits the man stays at her home occasionally, but that she does not engage in sexual activity with him. She also stated that this man is an ex-husband whom Jason knows as "grandpa Ernie." Respondent testified that after a final judgment of dissolution he plans to move into a home of his own with Jason.

Petitioner further testified that she feels respondent mentally abuses the child. Petitioner testified that Jason told her respondent's mother, Shirley Sampson, directed him to tell the judge he wanted to live with his father and visit his mother, because if he said anything other than that he would not be able to live with either of his parents. Sampson denies telling Jason what to say to the judge. According to petitioner, Jason also told her that respondent's mother, his grandmother, had told him to cry and throw a fit when it was time to go to petitioner's home. There was also testimony from petitioner that when respondent came to pick up Jason for his period of custody, respondent would bring along a police escort or several relatives. Petitioner stated this was "hard on Jason." She stated generally that Jason is anxious when he returns from visits with his father. Petitioner testified that respondent generally has attempted to influence Jason against her. Respondent himself admitted at trial that he has told Jason that "mommy did something to dad," but denies telling Jason anything more specific.

In an effort to show she was the proper custodian for Jason, petitioner presented numerous witnesses who testified regarding her relationship with the child. However, many of these witnesses also testified that respondent was a good father. Olga Kushnieryk, petitioner's mother, testified that petitioner provides the primary care for Jason and that petitioner and Jason have a very good relationship. Although Mrs. Kushnieryk stated that Jason relates well to his father, she testified that Jason was afraid of him. Michael Kushnieryk, petitioner's father, testified that petitioner is a patient mother and is a fit and proper custodial parent. He added, however, that both petitioner and respondent are good parents. Sue Firestine, a friend of the family, testified that petitioner and Jason get along well, and that petitioner is a very patient and good mother. Firestine also admitted that respondent was a good father. L. D. Fortner, a friend of the family, tes-

tified that petitioner and respondent are both good parents. Eileen Cooper, respondent's stepmother, and Alice Cooper, respondent's grandmother, testified on behalf of petitioner that she was a fit and proper parent to have custody of Jason and that she had a close relationship with the boy.

Petitioner testified that she has always provided the primary care for Jason, but admits respondent has helped with some of the tasks associated with raising a child. Petitioner testified she worked outside the home only a short period of time during the marriage because she wanted to stay at home with her son. She testified that respondent, meanwhile, worked long hours, leaving home at 6:15 a.m. and not returning until 8 p.m., and thus was not able to spend much time with Jason. Petitioner stated that respondent also worked at home on weekends. At the time of the proceedings below, petitioner was working full time from 8:15 a.m. to 4:45 p.m. Respondent's hours were 8 a.m. to 4:30 p.m.

■ While respondent contends generally an award of custody to petitioner based upon this record is against the manifest weight of the evidence, he specifically contends the court failed to consider Jason's preference regarding custody as is required under section 602(a)(2) of the Act (Ill. Rev. Stat. 1985, ch. 40, par. 602(a)(2)). Respondent testified that Jason has told him he wants to live with his father, and that he does not like to visit his mother. The psychologist, Dr. Ruffy, testified Jason told her he wanted to live with his father and visit his mother. Even petitioner admitted that Jason had told her he wanted to live with his father and visit his mother, although she stated that Jason explained that he thought if he said he wanted to live with his mother, he would never see his father again. Respondent also points to statements made by Jason to the judge during an interview in chambers. During that interview, Jason told the judge he wanted to visit with his mother and live with his father. Petitioner testified Jason told her this is what respondent's mother told him to say. Furthermore, when asked by the judge how often he wanted to visit with his mother, Jason stated: "Well, like, I stay with dad two weeks and I stay with mom one week, and then I come back there with mommy three weeks and I come back and stay with daddy four weeks, and then it keeps going that way." The judge asked Jason, "Is that what you have been doing now?" Jason responded by nodding his head affirmatively, and nodded his head again when asked by the judge if he liked that arrangement. The reference by the judge to the current arrangement was a reference to the temporary-custody order. That order provided for joint custody, with Jason spending roughly equal

amounts of time with his father and mother. In light of this arrangement, we do not find that Jason's statement unequivocally indicated a preference for living with his father. Jason told the judge he loved both of his parents, and that both of them play games with him. Even had this five-year-old unequivocally indicated a preference for living with his father, this preference, while entitled to consideration, is not binding on the court. *In re Marriage of Kush* (1982), 106 Ill. App. 3d 233, 236, 435 N.E.2d 921, 923.

On this record, we cannot say granting custody of Jason to petitioner is against the manifest weight of the evidence. Each party directs our attention to instances of what he or she feels is improper conduct on the part of the other spouse. Needless to say, no parent is perfect. The evidence suggests both petitioner and respondent are good parents. There was significant testimony that petitioner and Jason have a good relationship. Jason said he loved his mother. Furthermore, there was evidence petitioner has been Jason's primary care provider since his birth. While petitioner only worked a short time during the marriage, respondent worked long hours during the week and worked at home on weekends. Of course, respondent should not be penalized for attempting to earn a living, but it is the child's best interest which is paramount. (*In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 322, 490 N.E.2d 243, 249.) We acknowledge that petitioner now is employed full-time, but the court was entitled to consider that Jason has spent significantly more time of his young life with his mother and that awarding custody to her would provide some stability for the child.

■ ■ There is a strong and compelling presumption in favor of the trial court's determination of custody. (*In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 318, 490 N.E.2d 243, 246.) This is so because the trial court is in a better position to evaluate the credibility, temperaments, personalities and capabilities of both parents through the several days of the proceedings. (See *In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 715, 463 N.E.2d 773, 778.) Under all the circumstances of this case, we cannot say the award of custody to petitioner was against the manifest weight of the evidence.

■ Respondent's only other argument on appeal is that the court erred when it did not consider certain marital debts when it divided the marital property. In its judgment, the court ordered respondent to pay to petitioner $19,605.60 out of the cash which was part of the marital property. Respondent argues this amount is excessive and in support thereof directs our attention to this statement in the judgment: "In making the foregoing findings and orders, the Court found

\*\*\* that at the time of the separation, the parties had cash in the sum of $39,000.00, $6,000 accounts receivable and $700.00 accounts receivable, totaling $45,700.00." Respondent argues that the court's finding regarding the cash available was erroneously based upon the amount available at the time of the separation, and that the court consequently did not consider legitimate expenses paid out of these funds in the months between the separation and the final judgment.

While we agree the valuation of the marital property should be based upon the value as of the date of dissolution and not at the time of physical separation (*In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673, 683, 459 N.E.2d 1374, 1381-82), there is nothing in the record to indicate the court violated this rule. We acknowledge the court made a specific finding regarding the cash available at the time of the separation and did not make a specific finding regarding the amount available at the time of the judgment. However, this does not mean the court failed to consider the expenses incurred after the date of separation and the resulting change in the amount of cash available. "The trial court need not make specific findings of fact as to the value of the martial assets so long as the evidence of value in the record is sufficient to enable a court of review to analyze the property distribution. [Citation.]" *In re Marriage of Voight* (1982), 111 Ill. App. 3d 623, 628, 444 N.E.2d 694, 697.

We have reviewed the property distribution in its entirety and find it to be equitable. Respondent received a substantial amount of the property and was not ordered to pay maintenance. We find no abuse of discretion in the property distribution.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KASSERMAN, P.J., and JONES, J., concur.