*In re* MARRIAGE OF LINDA S. DALL, Petitioner-Appellee, and GERALD H. DALL, Respondent-Appellant.

Fifth District   No. 5—89—0042

Opinion filed December 14, 1989.

Richard W. Sterling, of Belleville, and Michael J. Costello, of Springfield, for appellant.

Eric M. Rhein, of Kuehn, Rhein & Trentman, of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

The marriage of petitioner, Linda S. Dall, and respondent, Gerald H. Dall, was dissolved by a judgment of the circuit court of Clinton County. Respondent appeals, contending the trial court erred (1) in awarding custody of the couple's only child, Edward Jerome (E.J.), to petitioner, and (2) in making certain distributions of marital property. We affirm.

Petitioner and respondent were married on August 17, 1979. Their only child, E.J., was born on July 15, 1981. Respondent has three children from a previous marriage. Petitioner has a set of twins, Darren and Damon Cooper, from a previous marriage. Respondent's children from the previous marriage never lived with the parties. The twins did live with the parties until Damon was 15 and Darren was 16.

Respondent was sheriff of Clinton County throughout the parties' marriage. Petitioner was employed in a variety of State jobs throughout the parties' marriage. Petitioner first left the marital home in mid-August 1985, living in Springfield, Illinois, until August 1, 1986, when the parties reconciled. During this period of time, E.J. stayed in Carlyle with his father. On March 24, 1987, petitioner filed a petition for dissolution seeking the permanent custody of E.J. On April 14, 1987, respondent filed a pleading seeking custody. Respondent filed a

counterpetition for dissolution.

On November 2, 1987, the case was tried on the custody issue only by agreement of the parties. Both parties took the position that the other parent was a proper and fit custodian, but that it was in E.J.'s best interest that his custody should be awarded to each of them respectively. The original trial judge, Judge Dennis L. Berkbigler, entered an order awarding permanent custody of E.J. to petitioner. On November 20, 1987, respondent filed a post-trial motion seeking a reversal of the custody award alleging error at the November 2, 1987, hearing and "newly discovered" physical abuse evidence of E.J. by his maternal half-brothers, Darren and Damon Cooper. Respondent then refused to physically turn over custody of E.J. to petitioner. On December 1, 1987, petitioner filed a petition for physical custody, child support, and contempt. On December 2, 1987, respondent filed a motion for appointment of a guardian *ad litem* (guardian) alleging sexual abuse of the minor son by his maternal half-brothers. A guardian was appointed. Respondent also filed a motion to reconcile on December 2, 1987.

On December 31, 1987, respondent filed a motion seeking psychiatric examination of petitioner. On April 21, 1988, the guardian requested the mental examination of both petitioner and respondent and also of E.J. That same day, the guardian recommended that physical custody of E.J. be removed from respondent and placed with the Segers, E.J.'s baby sitters since he was six weeks old. Limited visitation was set for both parents, and Dr. Tomkins, a psychologist, was appointed to perform psychological examinations on respondent, petitioner, and E.J.

On May 11, 1988, respondent sought and received a change of venue from Judge Berkbigler. Thereafter, Judge Edward C. Eberspacher was assigned to the instant case.

On July 22, 1988, respondent filed a petition to modify the custody award pursuant to section 610 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1987, ch. 40, par. 610) again alleging sexual abuse of E.J. by his maternal half-brothers. On August 22, 1988, the case was called on all issues, excluding custody. Respondent attempted to relitigate the custody issue which the trial court refused to allow. Respondent then sought a hearing on a motion for supervised visitation, alleging "newly discovered" abuse of E.J. by petitioner. This motion was unverified, unsupported by affidavit, and unspecific as to the nature of the alleged abuse. The trial court refused to hear the motion for supervised visitation under the circumstances and proceeded on the remaining issues.

On August 25, 1988, a judgment of dissolution was entered fully and finally adjudicating all issues between the parties, but staying the custody award to petitioner to allow respondent the opportunity to seek further stay of the custody award supported by this newly discovered evidence. On August 26, 1988, respondent filed a motion to modify custody pursuant to section 610 of the Act (Ill. Rev. Stat., 1987, ch. 40, par. 610) alleging sexual abuse of E.J., not only by his maternal half-brothers, but also by petitioner.

On September 1, 1988, a hearing was conducted on respondent's motion for supervised visitation. The father's expert psychologist, Dr. A.R. James, testified as to E.J.'s discussions with him that petitioner had sexually abused him by performing acts of fellatio and intercourse upon the child. The expert was unable to render an opinion within a reasonable degree of medical certainty whether petitioner had performed these acts or whether respondent had suborned E.J. to falsely accuse petitioner. Nonetheless, it was the expert's opinion that some type of sexual abuse had occurred, but the expert was unsure who the perpetrator was. Dr. James testified that the child's mental state was suffering because of the custody battle. The trial court then granted a stay of custody and placed the child with the Department of Children and Family Services (the Department) in Joliet for a period of 90 days. The trial court also appointed a board-certified child psychologist, Dr. Karen Brody, to examine E.J. and entered a no contact order against both the parties. This order prohibited the parties from visiting E.J., making telephone calls to E.J., or sending letters to E.J.

Dr. Brody filed her report on October 20, 1988, in which she concluded that she was unable to reach an opinion within a reasonable degree of medical certainty whether E.J. had been the subject of sexual abuse and, if so, by whom. On October 7, 1988, and again on October 27, 1988, petitioner filed pleadings seeking a modification of the August 25, 1988, order which stayed custody of E.J. On December 2, 1988, the case was called for trial on all parties' pleadings seeking a modification of the trial court's August 25, 1988, order relating to custody. Ultimately, the trial court denied both parties' petitions to modify. Guardianship of E.J. by the Department was terminated, and the Department was ordered to deliver the physical custody of E.J. to petitioner within five days.

Respondent's first issue on appeal is whether the trial court erred in awarding custody of E.J. to petitioner. First, respondent contends that the trial court did not consider what was in the best interest of E.J. and did not consider E.J.'s desire to live with respondent. Specifically, respondent criticizes the trial court for refusing to interview

E.J. *in camera*. Finally, respondent argues that the award of custody to petitioner was against the manifest weight of the evidence.

In determining custody, the primary consideration is the best interest and welfare of the child. (*Cooper v. Cooper* (1986), 146 Ill. App. 3d 943, 945, 497 N.E.2d 805, 806; *In re Marriage of Stuart* (1986), 141 Ill. App. 3d 314, 317-18, 490 N.E.2d 243, 246.) Section 602(a) of the Act requires the trial court to require the following in determining custody in accordance with the best interest of the child:

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall determine all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved; and

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person but witnessed by the child." (Ill. Rev. Stat. 1987, ch. 40, par. 602(a).)

We will not disturb the trial court's determination of custody unless it is against the manifest weight of the evidence or is manifestly unjust. *Cooper*, 146 Ill. App. 3d at 945, 497 N.E.2d at 806; *Stuart*, 141 Ill. App. 3d at 318, 490 N.E.2d at 246.

In attempting to show that custody should not have been awarded to petitioner, respondent points to the trial court's refusal to interview E.J. *in camera*. Respondent contends that the only evidence by which the child's desires as to whom his custodian would be was that given by the Segers, the temporary guardians of E.J. Respondent contends that it was wrong for the trial court not to take into consideration E.J.'s desire to stay in Carlyle with his father.

A review of the transcript indicates that respondent's own paid expert, Dr. James, E.J.'s psychologist, concluded that an *in camera* interview would be harmful to E.J. The transcript also reflects that E.J. did, in fact, desire to live with his father in Carlyle. This is not unusual, as most seven-year-olds would rather remain in their own home or at least in the city where they have grown up, rather

than be forced to move to a different location. Petitioner was clear that if she was granted custody, E.J. would move to Springfield with her. However, even if E.J. had unequivocally indicated a preference for living with his father during an *in camera* interview, this preference, while entitled to consideration, would not be binding on the court. *Cooper*, 146 Ill. App. 3d at 951, 497 N.E.2d at 809; see also *In re Marriage of Kush* (1982), 106 Ill. App. 3d 233, 236, 435 N.E.2d 921, 923.

■ Respondent also contends that the trial court failed to consider the relationship between E.J. and his maternal half-brothers compared to the relationship between E.J. and his paternal siblings. (See section 602(a)(3) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 602(a)(3)).) We agree with respondent that the testimony reflected that E.J. enjoyed a better relationship with his paternal half-siblings rather than his maternal half-siblings. Much of the testimony in the instant case centered around sexual abuse charged by E.J.'s maternal half-brothers. The Department conducted an investigation which "indicated" both of petitioner's twin teenage sons in sexually abusing E.J. However, no charges were filed against the twins. Expert child psychologists were unable to determine whether E.J. had, in fact, been abused. Respondent's own psychologist, Dr. James, believed that E.J. had been sexually abused, but was unable to determine who had been the perpetrator. It must also be noted that neither respondent's children nor petitioner's children were living with their respective parents at the time of this custody battle, and that section 602(a)(3) is but one criterion to consider in determining custody.

We next address respondent's contention that the trial court erred in ordering a complete prohibition of any contact between E.J. and either parent. On August 25, 1988, the trial court entered a judgment of dissolution of marriage adjudicating all rights of the parties and dissolving the marriage. In addition, because of general allegations of abuse raised by respondent, the trial court stayed the custody order awarding petitioner custody. E.J. was then left in the temporary custody of the Segers. On September 1, 1988, the trial court conducted a hearing to give respondent the opportunity to support allegations of abuse. At this time, the trial court was aware of the guardian's report which recommended joint custody. In the alternative, if joint custody was impossible, the guardian recommended that petitioner be awarded custody, "subject to the liberalest possible visitation" with respondent. The guardian also included in his report his findings that a series of "bizarre incidents" had occurred between the parties including "threats to life and limb, acts of vandalism, and fires at the

residences occurring under suspicious circumstances." The guardian believed that either one or the other party "was responsible for most, if not all, of such occurrences." However, the guardian was not in possession of any unimpeachable evidence which could identify the responsible party. The court was also aware of the report of the trial court's first appointed psychologist, Dr. Rachel Tomkins, which recommended that petitioner be given custody with equal visitation time for respondent. This recommendation was based in large part on Dr. Tomkins' opinion that petitioner is the more cooperative party. Dr. Tomkins also found petitioner to be "the better parent, in that she is more able to keep her needs separate from those of her son and doesn't involve E.J. in her struggle with her husband." Dr. Tomkins could not determine whether E.J. had been sexually abused, but recommended that Darren and Damon Cooper be kept away from E.J. unless such visits were supervised. In addition to these reports, the trial court heard testimony from respondent's expert, Dr. James, who determined that E.J. had, in fact, been sexually abused, but could not determine who the perpetrator was. Dr. James did believe that E.J. had been coached to make statements concerning alleged abuse by the twins.

The Department's case worker, Greg Hazen, testified that Darren and Damon Cooper had been indicated as sexual abusers of E.J. The allegations against petitioner had not been fully investigated at this point. The allegations were made on August 3, 1988, through the Department hot line. As of September 1, 1988, petitioner had not been interviewed by the Department concerning these allegations. The trial judge was also in receipt of several letters by the Segers that expressed their concern over E.J.'s emotional well-being because of the custody dispute. The Segers advised the trial judge of E.J.'s desire to remain in Carlyle with his father. At the close of the September 1, 1988, hearing on the motion to stay custody, the trial court ordered that the Department be made guardian of E.J. for 90 days. In explaining his order, the trial judge stated:

> "The testimony of Dr. James, however, convinces me that either the mother is practicing perverted sexual practices on her child, which is an idea abhorrent to me as the Court, or that the father is suborning the perjury of the child and corrupting the emotional and mental health of the child, which is an equally abhorrent concept to me. Coupled with that is my conclusion that the current custodians, temporary custodians, through the various documents that they have filed and have been admitted, have unrealistically, wholly unrealistically

adopted the father's position that a reconciliation is possible in this case. And the evidence establishes to my satisfaction that they're permitting visitation outside the scope of the visitation as has previously been ordered by the Court to the father. And I believe that it is in the best interest of the child that he be wholly removed from the Segers, he be wholly removed from the mother, he be wholly removed from the father, that he be placed in the custody of the Department of Children and Family Services and placed in foster care in a county outside of Sangamon County and Clinton County for a period of 90 days.

The Court appoints as its own expert a child psychiatrist with forensic experience, Dr. Karen Brody, Peoria. And I will state for the record at this time that I conversed with Dr. Brody this morning during these proceedings when I excused myself and advised counsel that I had a telephone call that related to this proceeding that I had to take, that Dr. Brody has agreed to act as the Court's expert in this matter. I will direct that she examine the record, common law record in this case, including the various admitted exhibits which I will provide her personally, with a cover letter, and I will of course provide a copy to both counsel so counsel will know what documents it is that I'm providing to Dr. Brody.

I order preparation of the report of proceedings of this hearing, the evidentiary portions only, for her review. I order the parties to make themselves available at her offices at 120 Northeast Glen Oak, Suite 300, Peoria, Illinois, 61603 at such times and dates as I shall advise your counsel. And if Dr. Brody feels it necessary to examine anyone else, I will tell counsel frankly that it is my intention to issue subpoenas for them if necessary and make those other persons available.

I'm going to order the Department of Children and Family Services not to disclose the whereabouts of the child to the parties, and there is to be no contact between the parties and the child until further order of the court; direct, indirect, personal, telephone or in any other fashion.

I do not do this lightly. I am a father; I have three children under the age of 12. There is only one thing I can imagine that is worse than the order that I have just entered, and that is that I should allow one of you to continue to either sexually abuse the child or mentally abuse the child. I don't know which one of you is lying, but one of you is lying. And I will have my own expert to assist me in finding the truth before I enter an

order in a matter as serious to the future and well-being of a child of this society as this."

■■ An unedited review of the trial court's oral order at the close of the hearing indicates that the trial judge was aware that his directive to place E.J. in the custody of the Department incommunicado was harsh. It also indicates that it was done with much thought as to what was in the best interest of E.J. Just as there is a strong and compelling presumption in favor of the trial court's determination of custody (*In re Marriage of Stuart* (1982), 141 Ill. App. 3d 314, 490 N.E.2d 243), so, too, we find a strong and compelling presumption in favor of the trial court's determination to place E.J. with the Department incommunicado. This presumption exists because the trial court is in a better position to evaluate the credibility, temperaments, personalities, and capabilities of both parties through the months of proceedings. See *Cooper*, 146 Ill. App. 3d at 951, 497 N.E.2d at 810; *In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 715, 463 N.E.2d 773, 778.

In the instant case, even the experts could not agree whether E.J. had, in fact, been sexually abused or whether respondent had suborned E.J. to commit perjury. The trial court was attempting to make this determination by investigating further and by keeping E.J. away from both parties, as well as E.J.'s temporary custodians, who had long ago taken sides with respondent. Under all these circumstances, we cannot say that the trial court abused its discretion in ordering that E.J. be placed in the custody of the Department. Instead, we applaud the trial judge for putting the interest of E.J. at the forefront of this litigation, something the parties were unable to do.

■■ Finally, we address respondent's contention that the trial court's award of custody to petitioner was against the manifest weight of the evidence. We have already addressed respondent's main contention that the trial court failed to consider E.J.'s preference regarding custody as is required under section 602(a)(2) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 602(a)(2)). After custody had been granted to petitioner on November 19, 1987, respondent immediately began alleging incidents of sexual abuse. The first allegations focused on E.J.'s maternal half-brothers as the perpetrators. The second series of allegations centered on petitioner as the perpetrator. In order to change the initial custody award, clear and convincing evidence that a change in circumstances has occurred since the initial determination is required. (Ill. Rev. Stat. 1987, ch. 40, par. 610(b).) Clear and convincing evidence does not require the degree of proof necessary to convict a person of a criminal offense, but it requires more than a

preponderance of the evidence. *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 786, 450 N.E.2d 1385, 1389.

In the instant case, in addition to the guardian's report and Dr. Tomkins' report that respondent had suborned E.J. to make false allegations of sexual abuse by his maternal half-brothers, respondent's own expert could not conclude who, in fact, was the perpetrator. The board-certified child psychologist could not discern the perpetrator. We find, as did the trial court, that the new evidence produced by respondent to support allegations of sexual abuse did not meet the requisite clear and convincing standard. We now need only decide whether the initial determination by the trial court to award petitioner custody is supported by the evidence.

From the record, we cannot say granting custody of E.J. to petitioner is against the manifest weight of the evidence. Originally, both parties agreed that the other was the fit parent, but each thought he or she would be a better custodial parent. Each party directs our attention to instances he or she feels is improper conduct on the part of the other spouse. For example, petitioner points out that respondent has exposed E.J. to firearms from a very young age and that respondent has taken E.J. on sheriff-related work, including viewing a drowning victim. Petitioner contends this puts E.J. at risk both physically and emotionally. On the other hand, respondent contends that petitioner has done a bad job with the twins by her first marriage and that these children are undisciplined and have had numerous traffic arrests. Respondent wants better discipline for E.J. There are allegations of alcohol abuse by each party against the other throughout the transcript. Suffice it to say, neither parent is perfect. The evidence suggests that both parents have different parenting skills with each having his or her own strengths and weaknesses. The guardian and the court-appointed psychologist both found that petitioner should be the custodial parent. Furthermore, there was evidence that petitioner was the primary care-giver during most of E.J.'s short life. As a sheriff, respondent is involved in a job which requires irregular hours and the possibility of being called away any time day or night. Under all these circumstances, we cannot say that the award of custody to petitioner was against the manifest weight of the evidence.

The final issue we are asked to consider is whether the trial court made just distributions of certain items of marital property. Specifically, respondent contends that the jointly held savings account was not divided proportionately, that a lump sum award of $6,000 to petitioner was unnecessary, that ordering respondent to sell his pickup

truck was an abuse of discretion, and, finally, that the award of part of respondent's pension benefits to petitioner was an abuse of discretion. We disagree.

■■ The trial court is required to distribute marital property in an equitable manner taking into account all relevant factors. (*In re Marriage of Kopec* (1982), 106 Ill. App. 3d 1060, 1063, 436 N.E.2d 684, 687.) The distribution of marital property rests with the sound discretion of the trial court, and its decision will not be reversed absent an abuse of discretion. *In re Marriage of Fleming* (1980), 80 Ill. App. 3d 1006, 1008, 400 N.E.2d 625, 627.

■■ Respondent cited no case law for any of his propositions that the trial court erred when distributing marital property. Respondent's apparent argument is that the distribution is manifestly unfair. We note that this was both party's second marriage. They obviously both came into the marriage with acquisitions of personalty and pensions. We agree with respondent that there are some gaps in the record as to why the trial court ruled as it did. However, we find that in looking at the record as a whole, we cannot say the trial court erred. No award of alimony was made nor was respondent ordered to pay petitioner's attorney fees. Of great consequence was the evidence that petitioner had contributed 33,000 premarital dollars to the parties' marital home. This fact can explain the $6,000 cash award to petitioner, the pension award, as well as the savings account distribution. Likewise, we find no error in the trial court's order to force respondent to sell his pickup truck, in light of the fact that respondent was supplied with a county car which could also be used for personal business. We hold, therefore, that the settlement was fair and that the trial court did not abuse its discretion in this case.

For the foregoing reasons, the judgment of the circuit court of Clinton County is affirmed.

Affirmed.

HARRISON and HOWERTON, JJ., concur.