*In re* MARRIAGE OF DAVID W. HASLETT, Petitioner-Appellee, and DELENA L. HASLETT, Respondent-Appellant.

Fifth District    No. 5—92—0827

Opinion filed February 7, 1994.

John J. Ammann, of Land of Lincoln Legal Assistance Foundation, Inc., of Alton, for appellant.

No brief filed for appellee.

JUSTICE WELCH delivered the opinion of the court:

Delena Haslett appeals from an order of the circuit court of Montgomery County ostensibly awarding custody of her son, David Haslett, Jr., to the child's father, David Haslett, but ordering that the father execute legal documents effectively giving custody of the child to Richard and Connie Haslett, the father's brother and sister-in-law.

On November 18, 1989, David and Delena Haslett were married

in Fillmore, Illinois. On February 21, 1991, Delena gave birth to David Haslett, Jr. (DJ). On March 10, 1992, David Haslett (father) filed in the circuit court of Montgomery County a *pro se* petition for dissolution of marriage against Delena Haslett (mother). In his petition, the father requested that "temporary legal guardianship be given to Richard and Connie Haslett while the plaintiff begins back to work." On April 20, 1992, the mother filed her answer and a counterpetition for dissolution of marriage, asking for sole custody of DJ. On April 21, 1992, the mother filed a petition for temporary custody.

A hearing was held in the circuit court of Montgomery County on May 4, 1992. The father represented himself, and the mother was represented by an attorney from the Land of Lincoln Legal Assistance Foundation. After disposing of all the issues relating to property, debts, and maintenance, the court then heard testimony on the two remaining issues of custody and child support. The father testified first and stated that he: (1) was an elephant handler with the Great American Circus; (2) would be returning to work within the next day or two; (3) worked nine months (March through November) a year, during which time he travelled all over the country; (4) would not be returning to Illinois at any time during those nine months; (5) would only be in Illinois three months (December through February) a year; (6) wanted to leave DJ with his brother and sister-in-law for the nine months that he would be working out of State; (7) had a four-year-old daughter with another woman; (8) had never met this daughter nor paid any child support for her; (9) had been convicted of operating a motor vehicle without insurance; and (10) had spent some time in jail during the marriage on charges that were later dismissed.

The father also testified that: (1) during the time he and the mother lived together, the mother did not properly feed, bathe, or keep clean clothes on DJ; (2) because he was at work most of the time (8 to 12 hours a day), his statements concerning the mother's allegedly improper care of DJ were based, not upon firsthand knowledge, but rather upon his observations that just about every time he came home from work, DJ would be "screaming [his] heart out and hungry," and that DJ had dry skin and was "real cranky"; (3) whenever DJ cried, the mother would get real upset and "start yelling at it to shut up and throwing it down in its bed"; (4) DJ was taken to the hospital around October 15, 1991, to find out why he was not gaining weight; (5) in early November of 1991, he took the mother to Springfield, Illinois, and left her there without transportation; and (6) he and DJ had lived with the uncle and aunt since November of 1991.

The next witness to testify was Shelly Angle, a family care worker with Catholic Charities. She testified, inter alia, that: (1) the uncle and aunt were providing proper care for DJ and (2) she could not weigh one parent against the other. The uncle then testified that: (1) he had seen the mother slap DJ around, "simply ignore him when he was crying," and not feed him; (2) the mother had left DJ alone in the trailer more times than he could count; (3) he had gotten out of jail on March 7, 1992, after serving time on a conviction for driving on a revoked license; (4) he had two DUI convictions; (5) he attended Alcoholics Anonymous meetings every week and has been sober for over a year and a half; and (6) the father and mother lived in a "very dirty" trailer (e.g., dirty diapers on the floor, dirty dishes on the table, dirty clothes lying all over, and trash lying all over the floor), but that he could not "put the blame on either because they was [sic] both living there."

The aunt then testified that: (1) DJ was born premature on February 21, 1991, and that, as a result, he stayed in the hospital for three months; (2) she and her husband wanted to eventually get custody of DJ; (3) the mother loved DJ but was not feeding him properly; (4) at times DJ would go unfed; (5) the mother would not bathe DJ; (6) DJ would wear the same clothes for days; and (7) the mother did well by taking DJ to the doctor when he was sick.

Lastly, the mother testified that: (1) when DJ was seven months old, the father "smacked" him because he would not stop crying; (2) the father would yell at DJ to stop crying; (3) about a month before she and the father separated, the father threw a bowl at her, which missed and hit her niece; (4) on that same day, the father hit her with his fist and put his hands around her throat; (5) on other occasions, the father had raised his hand in a threatening manner; (6) the father said he would "grab [DJ] and drop him" if she tried to leave with DJ; (7) due to DJ's small size, he needed to eat every two to four hours; (8) the father "once in a great blue moon" would help feed DJ, clean the house, or cook; (9) after the aunt had shown her how to bathe DJ, she had given him a bath every day; (10) she had never left DJ unattended; (11) she had never slapped DJ or thrown him down into his bed; (12) she loved DJ; (13) when the trailer got dirty, she would let the aunt baby-sit so that she could clean up; (14) in November of 1991, the father had left her in Springfield with no transportation; (15) she spent approximately two months in the hospital (November-December 1991) being treated for postpartum depression; (16) after getting out of the hospital, she had made attempts to see DJ, but the father refused to bring DJ to Springfield or otherwise help her see DJ; (17) unable to see DJ, she called the

father and wrote letters inquiring about DJ; (18) she was looking for a job but might go on public aid until she found one; and (19) she would be willing to cooperate with Catholic Charities and the Department of Children and Family Services (DCFS) if she were awarded custody.

After hearing this evidence, the court awarded temporary physical custody of DJ to the aunt and uncle even though they were not parties, had not intervened, and had not filed any petition. The court stated it wanted a home study of the mother, the father, and the aunt and uncle. The court also wanted to hear from a DCFS investigator who might know about the case. Although the mother argued that the aunt and uncle had no standing to be awarded custody, the court refused to rule on the issue of standing. The court stated: "If I have the power, this child's staying with Connie[;] *** whatever it takes for me to get the child to Connie, I've got to do ***." Lastly, the court set a status hearing for July 6, 1992.

Because the home study was not complete, the July 6, 1992, status hearing was very brief. On July 13, 1992, an attorney hired by the aunt and uncle entered an appearance on their behalf but filed no pleading of any sort. On September 8, 1992, the mother filed a motion to dismiss the aunt and uncle's entry of appearance. In her motion, the mother argued that the aunt and uncle should not be allowed to participate in the case because they had not sought leave to intervene pursuant to section 601(c) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601(c) (West 1992)) (Dissolution Act) nor had they filed a petition alleging standing of a nonparent under section 601(b) of the Dissolution Act (750 ILCS 5/601(b) (West 1992)).

On September 11, 1992, the aunt and uncle filed a petition for custody but did not file a petition for leave to intervene. A second status hearing, held on September 11, 1992, was very brief because the home study had not been completed. Although the mother argued that the court should rule on the standing issue, the court refused and instead scheduled another hearing for October 5, 1992. On September 29, 1992, the mother filed a motion to dismiss the aunt and uncle's petition for custody. At the hearing on October 5, 1992, the court was unable to recall whether the mother had raised her objections to standing and, as a result, asked to see a transcript of the proceedings.

On October 16, 1992, yet another hearing was held. The court, having reviewed the transcript of the May 4 hearing, found that the mother had clearly preserved her objection to standing. The aunt and uncle admitted that they did not have standing prior to the May

4 court order awarding them temporary physical custody. After hearing arguments, the trial judge called the DCFS hotline and spoke to an investigator in an attempt to get DCFS involved in the case. The court then advised the aunt and uncle that they could file a juvenile petition. At no time did DCFS ever become involved in the case, nor did the aunt and uncle ever file a juvenile court petition.

Six months after the final hearing in the divorce case (*i.e.*, May 4, 1992), the court, at a hearing on November 6, 1992, held that the aunt and uncle lacked standing to seek custody of DJ in a dissolution action between the father and the mother. The court further held that the aunt and uncle had to proceed under the stricter requirements imposed by the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)) or the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1992)). The court also heard uncontradicted testimony from the mother that: (1) she lived in Springfield with a girl friend and was employed as a baby-sitter; (2) the home in which she lived had adequate room for DJ; and (3) she was capable of caring for DJ. The uncle stated that neither he nor his wife had heard anything from the father since the May 4, 1992, hearing.

At the conclusion of the hearing, the court announced its ruling on custody, then entered a written judgment on November 10, 1992. The judgment awarded custody of DJ to the father, but required him to "execute within thirty (30) days all necessary legal documents that allow Richard and Connie Haslett to tend to all of the child's needs while [father] is away, especially in regard to medical needs." The judgment also granted the mother visitation, with the father being responsible for the cost of transportation. Lastly, the judgment dissolved the marriage and incorporated the settlement of the parties on the property and maintenance issues.

In announcing its ruling at the November 6 hearing, the court admitted that "it ha[d] the practical effect of turning the child over to the aunt and uncle." When counsel for the mother asked the court what would happen if the father revoked his consent to have the aunt and uncle care for DJ and instead wanted to take DJ with him, the court responded that that would be "a significant change in circumstances in the case." In its written findings entered on November 10 in conjunction with the judgment, the court stated:

> "A father requesting the custody of a child with this father's background, and history with the child, and future plans for raising the child would ordinarily not win an award of custody. This father has never personally taken care of the child's daily needs. *** The father's employment as an elephant trainer in a circus will cause him to be away from the child continually except

from December through February. *** He was unable to be located by the child custody investigator for the report. *** The father has not been cooperative in allowing D.J. to have visits with [his] mother."

Since the father had not been present for any of the five hearings in the case since May 4, and in light of the uncle's testimony that he and his wife had not heard from the father since May, the court scheduled yet another hearing for November 30, 1992, to confirm that the father was still alive and still wanted the aunt and uncle to have custody. At the hearing, the father was present and confirmed that he wanted his son to remain in the custody of the aunt and uncle. The father testified that he was still employed with the circus and would be going back to work as soon as "it gets a little warmer." The father also testified that he had no plans to personally care for DJ except for the few months that he would be home.

On December 3, 1992, the father and the aunt and uncle entered into and filed with the court a document labeled "guardianship agreement." The mother was not a signatory to this document. In this agreement, the father states: "it is in the best interest of the child that he resides with and be under the care and control of the Custodians [*i.e.*, the aunt and uncle]." The father additionally states:

"[Father] gives the child to the Custodians and relinquishes and grants the Custodians the sole care, control and handling of the child during the parent's employment with the circus ***. The custodians are authorized and empowered to responsibly and ethically discipline the child, authorize appropriate medical treatment, operations, blood transfusions, and in all other respects to care for and control the child as if he were their own."

This agreement further states that if "the Custodians deem it necessary, they are entitled to petition any appropriate court for their appointment as custodians of the child." The agreement also allows the aunt and uncle to claim DJ as a dependent on their income tax returns. At no time, however, was a petition for guardianship ever filed, and at no time was a court order entered adopting this agreement.

The mother now appeals and raises the following issues: (1) whether the trial court erred in effectively awarding custody of a minor child in a divorce proceeding to the child's aunt and uncle, after the court had found the aunt and uncle had no standing to seek custody; (2) whether the purported guardianship agreement is void as failing to comply with the Probate Act of 1975 (755 ILCS 5/1—1 *et seq.* (West 1992)); and (3) whether the trial court's judgment ostensibly awarding custody to the father but directing that he relinquish all

control over the child to the child's aunt and uncle is against the manifest weight of the evidence and whether it constitutes an abuse of discretion. We answer in the affirmative on all issues and reverse the trial court.

■ The trial court was correct in ruling that the aunt and uncle had no standing in this case. However, the trial court failed to follow its own ruling and, as a result, committed reversible error when it effectively awarded the aunt and uncle custody. Before nonparents are allowed to petition for custody of a child under the Dissolution Act, they must satisfy a standing requirement—*i.e.*, that the child is not in the physical custody of one of his parents. (750 ILCS 5/601(b) (West 1992); *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 52-53, 491 N.E.2d 1150, 1152; *In re Custody of McCuan* (1988), 176 Ill. App. 3d 421, 425, 531 N.E.2d 102, 105.) The aunt and uncle could not overcome this hurdle because the father had physical custody of DJ up until the May 4, 1992, hearing.

The standing requirement imposed under the Dissolution Act must also be established before a nonparent can petition for guardianship of a child under the Probate Act. (*In re Person & Estate of Newsome* (1988), 173 Ill. App. 3d 376, 379, 527 N.E.2d 524, 525.) This is because the Probate Act codifies the superior parental rights doctrine. (See 755 ILCS 5/11—7 (West 1992); *In re Person & Estate of Barnhart* (1992), 232 Ill. App. 3d 317, 320, 597 N.E.2d 1238, 1240; *Newsome*, 173 Ill. App. 3d at 379, 527 N.E.2d at 525.) In Illinois, it is a well-accepted proposition in child-custody disputes that the right of a natural parent in the care, custody, and control of a child is superior to the claim of third parties. (*In re Custody of Townsend* (1981), 86 Ill. 2d 502, 508, 427 N.E.2d 1231, 1234.) This presumption in favor of a natural parent to the custody of his or her child is often termed the superior parental rights doctrine (see Gitlin, *Defining the Best Interest of Children: Parents v. Others in Custody Proceedings*, 79 Ill. B.J. 566, 566-68 (1991) (Gitlin) (discussing the historical development of the doctrine in Illinois)) and finds expression in our statutory law. (*In re Custody of Peterson* (1986), 112 Ill. 2d 48, 52, 491 N.E.2d 1150, 1152.) The Dissolution Act maintains the superior parental rights doctrine by imposing a standing requirement that allows nonparents to be parties in a custody case only when the child is not in the physical custody of one of his or her parents. (Gitlin, 79 Ill. B.J. at 568.) In other words, the standing requirement supports the superior parental rights doctrine:

> "[I]t is virtually impossible for third parties to obtain standing to bring child custody proceedings under the [Dissolution Act] if one of the parents is alive and if the living parent has not been such a

bad parent that grounds for removal of custody, or grounds for termination of parental rights, can be brought under the Juvenile Court Act or the Adoption Act." Gitlin, 79 Ill. B.J. at 568-69.

Once nonparents are held to lack standing under the Dissolution Act or the Probate Act, the nonparents must be dismissed from the case. (*Barnhart*, 232 Ill. App. 3d at 322, 597 N.E.2d at 1242.) The only recourse a nonparent has after dismissal from a dissolution or guardianship proceeding is to file a petition under the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)) or the Juvenile Court Act (705 ILCS 405/1—1 *et seq.* (West 1992)) and prove that the parent is "unfit." (*Barnhart*, 232 Ill. App. 3d at 322, 597 N.E.2d at 1242; *In re Marriage of Sechrest* (1990), 202 Ill. App. 3d 865, 870, 560 N.E.2d 1212, 1215.) Neither DCFS nor the aunt and uncle elected to pursue such a route.

The trial court found itself faced with a dilemma: it was unwilling to award custody to either parent and it was unable to get DCFS involved in the case. The court resolved this dilemma by ostensibly awarding custody to the father but simultaneously ordering him to execute documents that gave the aunt and uncle control of DJ. Such an outcome is nothing less than a fulfillment of the court's avowed desire to award custody to the aunt and uncle. In essence, the father became nothing more than a straw man or conduit used by the court to effectuate a custody disposition which the court was otherwise without power to order. Not only does such a ruling circumvent the standing requirement of the Dissolution Act and the Probate Act, it also guts the superior parental rights doctrine. Moreover, it leads to the anomalous result of awarding custody to persons who were not parties to the case, who did not petition to intervene, and over whom the court had no jurisdiction. Although the trial court may well have thought it to be in DJ's best interests to be placed with his aunt and uncle, "[i]t is only after a nonparent has established standing that the court determines custody or guardianship using the best interests of the child standard." (*Barnhart*, 232 Ill. App. 3d at 321, 597 N.E.2d at 1241.) We therefore conclude that the trial court reversibly erred in failing to follow its own ruling, that the aunt and uncle lacked standing to ask for custody, when it effectively awarded them custody.

■ We now turn to address the second issue: the validity of the purported "guardianship agreement." This document, filed in response to the court's order that such a document be executed, purports to transfer legal custody of DJ from the father to the aunt and uncle. We find that this agreement is invalid because it completely fails to conform to the requirements of the Probate Act (755 ILCS 5/1—1 *et seq.* (West 1992)).

Under section 11—5 of the Probate Act, a guardian may be appointed *by the court* upon the filing of a petition or upon the court's own motion. (755 ILCS 5/11—5 (West 1992).) Under section 11—13 of the Probate Act, the court has control over the minor, and it is only under the court's direction that the guardian has authority to act on behalf of the minor. (755 ILCS 5/11—13 (West 1992).) Additionally, section 11—10.1 of the Probate Act requires that notice of the hearing on the petition for appointment of a guardian be given to the relatives whose names and addresses appear in the petition. (755 ILCS 5/11—10.1 (West 1992); see 755 ILCS 5/11—8(b)(2) (West 1992) (requirement that petition for guardianship state names and addresses of the parents).) Lastly, as previously discussed, the aunt and uncle had no standing to seek guardianship. The same standing requirement imposed by the Dissolution Act applies to the Probate Act. (*In re Person & Estate of Newsome* (1988), 173 Ill. App. 3d 376, 379, 527 N.E.2d 524, 525.) Because none of the aforementioned procedures of the Probate Act were followed in this case, the "guardianship agreement" entered into between the father and the aunt and uncle is invalid.

We now turn to the third issue and find that the trial court's order "awarding" custody to the father was against the manifest weight of the evidence. We also find that the trial court's attempt to direct the father to relinquish control over the child to nonparties constitutes an abuse of discretion. Although a trial court has broad discretion in making custody determinations, the appellate court will reverse if the determination is against the manifest weight of the evidence. *In re Marriage of Radae* (1991), 208 Ill. App. 3d 1027, 1029-30, 567 N.E.2d 760, 761.

■ Section 602 of the Dissolution Act requires courts to determine custody according to the best interest of the child standard. (750 ILCS 5/602 (West 1992).) All relevant factors, including those enumerated in section 602, must be considered in calculating the child's best interest. (*Cooper v. Cooper* (1986), 146 Ill. App. 3d 943, 945, 497 N.E.2d 805, 806.) Although section 602 lists seven factors, only the first, third, sixth, and seventh factors have any relevance in this case. The first factor is the wishes of the child's parents as to custody. (750 ILCS 5/602(a)(1) (West 1992).) From the outset, the mother made it clear that she wanted custody. The father, on the other hand, made it equally clear that he did not want custody but instead wanted the aunt and uncle to have custody for at least nine months out of the year. Even if the father had wanted custody, a parent who immediately upon being awarded custody disavows all custodial responsibility by placing the child in the care of third

parties cannot be said to be truly interested in custody. In any event, we find that the first factor cuts in favor of the mother and against the father.

The third factor is "the interaction and interrelationship of the child with his parent or parents." (750 ILCS 5/602(a)(3) (West 1992).) As the trial court observed, the father had "never personally taken care of the child's daily needs." During the nearly seven-month span after the May 4, 1992, hearing to sometime around November 30, 1992, the father did not have any contact with DJ. The father even testified that he had no plans to see or care for his son the nine months out of the year he would be working with the circus.

Perhaps the most important variable affecting a parent's ability to interact with his or her children is the number of hours he or she works. In *Cooper v. Cooper* (1986), 146 Ill. App. 3d 943, 950-51, 497 N.E.2d 805, 809-10, the court affirmed a custody award to the mother, based in part upon the fact that the father worked from 6:15 a.m. to 8 p.m. during the weekdays and worked at home on the weekends. In *In re Marriage of Leopando* (1982), 106 Ill. App. 3d 444, 450, 435 N.E.2d 1312, 1317, *aff'd* (1983), 96 Ill. 2d 114, 449 N.E.2d 137, the court reversed a custody award to a father who had a busy medical practice partly because "his ability to be in close contact with the child [was] seriously undermined." In *In re Marriage of Lovejoy* (1980), 84 Ill. App. 3d 53, 56-57, 404 N.E.2d 1092, 1095, the court affirmed a custody award in favor of the mother based upon, *inter alia*, the fact that the father worked 12 hours per day, four days a week, eight hours per day on Friday, and half a day on Saturday. In the instant case, the father's work hours are even more demanding than those in the three cases cited above: no contact whatsoever nine months out of the year. Given the father's negligible interaction—both past and prospective—with DJ, the third factor cuts in favor of the mother and heavily against the father.

The sixth factor is the "physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person." (750 ILCS 5/602(a)(6) (West 1992).) The mother testified that the father had struck the child, had threatened to drop the child, had physically attacked her, had made threatening gestures toward her, and had struck a niece with a bowl that he had thrown at the mother. Although the father and uncle both testified that the mother had struck DJ, the mother denied ever doing so. The father, however, never refuted or denied the mother's allegations concerning his violent propensities. Therefore, this factor also cuts in favor of the mother and against the father.

The seventh and last factor is "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." (750 ILCS 6/602(a)(7) (West 1992).) The trial court expressly found that the father had not cooperated in allowing DJ to see his mother. Moreover, the father actively tried to keep DJ away from his mother. First, the father abandoned the mother in Springfield with no transportation, no means to procure transportation, and no arrangements for transportation. Second, the father deposited DJ with his aunt and uncle to further keep DJ from his mother. The evidence also showed that the father had done absolutely nothing to help facilitate a relationship between DJ and his mother. Thus, the seventh factor also cuts against the father and in favor of the mother.

The evidence indicates that the mother loves her son, lives in Springfield with a girl friend, and is employed as a baby-sitter. While this court has the authority under Supreme Court Rule 366 (134 Ill. 2d R. 366) to award custody of the child to the mother and to "order the Department of Children and Family Services to exercise continuing supervision over the case to assure that the custodial or visitation terms of the judgment are carried out" (750 ILCS 5/608(b) (West 1992)), we decline to do so in this case. While we have concluded that the trial court erred and must be reversed, we are also cognizant of the fact that the trial judge was deeply concerned about the welfare of this infant if he was placed in the mother's custody. We are also unaware from the record of what changes, if any, have occurred in the mother's capabilities since this cause began. Therefore, we reverse and remand this case to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

CHAPMAN and MAAG, JJ., concur.